**U.S. HEALTHCARE, INC., United States Health Care Systems of Pennsylvania, Inc. and Health Maintenance Organization of New Jersey, Inc., Appellants in 88–1180,**

v.

**BLUE CROSS OF GREATER PHILADELPHIA, Pennsylvania Blue Shield and David Markson.**

**Appeal of BLUE CROSS OF GREATER PHILADELPHIA ("BLUE CROSS") and Pennsylvania Blue Shield ("Blue Shield"), in No. 88–1205.**

**Nos. 88–1180, 88–1205.**

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1988.

Decided March 9, 1990.

Rehearing and Rehearing In Banc Denied April 4, 1990.

David F. Simon (argued), David I. Bookspan, Gary L. Leshko, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for appellants-cross-appellees, U.S. Healthcare, Inc., U.S. Health Care Systems of Pennsylvania, Inc. and Health Maintenance Organization of New Jersey, Inc.

Jay H. Calvert, Jr. (argued), John H. Lewis, Jr., Ronald B. Hauben, Morgan,

Lewis & Bockius, Philadelphia, Pa., for appellees-cross-appellants, Blue Cross of Greater Philadelphia and David S. Markson.

Henry Kolowrat, Dechert, Price & Rhoads, Philadelphia, Pa., James A. Young (argued), Timothy I. McCann, Sprecher, Felix, Visco, Hutchison & Young, Philadelphia, Pa., for appellee-cross-appellant, Pennsylvania Blue Shield.

Before STAPLETON, SCIRICA and COWEN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

U.S. Healthcare, Inc. and its subsidiaries, United States Health Care Systems of Pennsylvania, Inc. and Health Maintenance Organization of New Jersey, Inc. (collectively, "U.S. Healthcare"), appeal from the district court's post-trial entry of judgment in favor of Blue Cross of Philadelphia, its president David Markson, and Pennsylvania Blue Shield (collectively, "Blue Cross/Blue Shield"), directed under Fed.R. Civ.P. 50(b) on U.S. Healthcare's federal and pendent state law claims alleging violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), commercial disparagement, defamation and tortious interference with contractual relations. Blue Cross/Blue Shield, in turn, appeals from the entry of judgment on the verdict in favor of U.S. Healthcare on Blue Cross/Blue Shield's counterclaims alleging the same causes of action brought by U.S. Healthcare. Additionally, Blue Cross/Blue Shield appeals the pre-trial dismissal of the abuse of process counts in its counterclaims. We will reverse the grant of the Rule 50(b) motions, the judgment on the verdict in favor of U.S. Healthcare on Blue Cross/Blue Shield's counterclaims and the dismissal of the counts on abuse of process.

1. Through a joint operating agreement, Blue Cross acts as Blue Shield's agent in Southeastern Pennsylvania.

## I.

## FACTS AND PROCEDURAL HISTORY

These cross appeals arise from a comparative advertising war between giants of the health care industry in the Delaware Valley—U.S. Healthcare on the one side and Blue Cross/Blue Shield on the other. The thrust of these claims is that each side asserts the other's advertising misrepresented both parties' products.

For over fifty years, Blue Cross/Blue Shield operated as the largest health insurer in Southeastern Pennsylvania by offering "traditional" medical insurance coverage.[1] Traditional insurance protects the subscriber from "major" medical expenses, with the insurer paying a negotiated amount based upon the services rendered, and the subscriber generally paying a deductible or some other amount. The subscriber has freedom in choosing hospitals and health care providers (i.e., doctors).

In the early 1970's, U.S. Healthcare began providing an alternative to traditional insurance in the form of a health maintenance organization, generically known as an "HMO." An HMO acts as both an insurer and a provider of specified services that are more comprehensive than those offered by traditional insurance. Generally, HMO subscribers choose a primary health care provider from the HMO network who coordinates their health care services and determines when hospital admission or treatment from a specialist is required. Usually, subscribers are not covered for services obtained without this permission or from providers outside this network. By 1986, U.S. Healthcare was the largest HMO in the area, claiming almost 600,000 members.[2] During the same period, Blue Cross/Blue Shield experienced a loss in enrollment of over 1% per year, with a large number of those subscribers choosing HMO coverage over traditional insurance, and a majority of those defectors choosing a U.S. Healthcare company.

2. The testimony at trial indicated that there are fifteen or sixteen HMO's in the Philadelphia area, with four of them enjoying the greatest market share.

Blue Cross/Blue Shield considered a number of strategies to regain its market position, including the acquisition of its own HMO.[3] In late 1985, in an admitted attempt to compete with HMO, Blue Cross/Blue Shield introduced a new product that it called "Personal Choice," known generically as a preferred provider organization or "PPO." PPO insurance provides subscribers with a "network" of health care providers and hospitals, and generally "covers" subscribers only for services obtained from the network providers and administered at the network hospitals. Subscribers must obtain permission to receive treatment from providers outside the network, and in such instances receive at most only partial coverage.

Thereafter, Blue Cross/Blue Shield consulted with two separate advertising agencies before arriving at a marketing strategy for its new product.[4] In July 1986, Blue Cross/Blue Shield launched what it termed a deliberately "aggressive and provocative" comparative advertising campaign calculated "to introduce and increase the attractiveness of its products"—in particular, Personal Choice—at the expense of HMO products. Blue Cross/Blue Shield's campaign, which included direct mailings, as well as television, radio and print advertisements, ran for about six months at a total cost of approximately $2.175 million. According to a Blue Cross memorandum that purported to reflect the directions of Markson, the campaign was designed specifically to "reduce the attractiveness of [HMO]."

The Blue Cross/Blue Shield advertising campaign consisted of eight different advertisements for the print media, seven different advertisements for television, three different advertisements for radio, and a direct mailing including a folding brochure.

The eight print advertisements compare the features of HMO and Personal Choice. Seven of the eight represent that with HMO, the subscriber selects a "primary care physician" who, in turn, must give permission before HMO will provide coverage for examination by a specialist. (The eighth print advertisement simply states that with Personal Choice, the subscriber may be examined by a specialist whenever he chooses, without "permission.") After describing HMO's referral procedure, however, three of the eight print advertisements—as well as the brochure—say the following:

> You should also know that through a series of financial incentives, HMO encourages this doctor to handle as many patients as possible without referring to a specialist. When an HMO doctor does make a specialist referral, it could take money directly out of his pocket. Make too many referrals, and he could find himself in trouble with HMO.[5]

One of the print advertisements and the brochure also feature a senior citizen under the banner heading "Your money or your life," juxtaposed with Blue Cross/Blue Shield's description of "The high cost of HMO Medicare."

Of the seven television advertisements run by Blue Cross/Blue Shield, four are innocuous, mentioning HMO only in the closing slogan common to all seven of the ads: "Personal Choice. Better than HMO. So good, it's Blue Cross and Blue Shield." The fifth features an indignant every man, who simply states "I resent having to ask my HMO doctor for permission to see a specialist," before a spokesperson extols the benefits of Personal Choice without reference to HMO until, again, the closing slogan. The sixth features a cab driver who says, "I don't like those HMO health

---

**3.** At the end of 1986, Blue Cross's holding company, QQC, Inc., acquired Delaware Valley HMO. In the words of Markson, who also served as president of QQC, the acquisition was made in order to "move the corporation into the triple option [of traditional, PPO, and HMO insurance]."

**4.** Under the joint operating agreement, Blue Cross acted as Blue Shield's agent in preparing

and publishing the advertisements. Blue Shield, however, had the right to veto any advertising prior to publication.

**5.** One of the print advertisements replaces the last sentence with the question, "How many doctors do you know who want to pay your doctor's bill?"

plans. You get one doctor, no choice of hospitals," before a shopper tells him about the virtues of Personal Choice—again, without reference to HMO until the closing slogan. The seventh television advertisement used by Blue Cross/Blue Shield, while following the same general format, seems to us a dramatic departure from the others in that it appears consciously designed to play upon the fears of the consuming public. The commercial features a grief-stricken woman who says, "The hospital my HMO sent me to just wasn't enough. It's my fault." The implication of the advertisement is that some tragedy has befallen the woman because of her choice of health care.

The three radio advertisements of Blue Cross/Blue Shield compare the features of HMO and Personal Choice. All represent that HMO limits choice of hospitals and physicians and requires plan permission to see a specialist, but that Personal Choice provides unlimited choice of network hospitals and physicians and affords unrestricted access to specialists.

U.S. Healthcare responded immediately to Blue Cross/Blue Shield's promotional campaign. Within a week, U.S. Healthcare filed suit in Philadelphia County Court of Common Pleas alleging commercial disparagement, defamation and tortious interference with contractual relations. U.S. Healthcare also issued concurrent press releases describing the basis of the litigation. In addition, the company embarked upon its own aggressive, comparative advertising blitz.

The responsive advertising campaign, which began sometime after the Blue Cross/Blue Shield campaign and ran until late February 1987, cost $1.255 million. U.S. Healthcare's campaign consisted of five different advertisements for the print media, four different television advertisements, and two different radio advertisements. Of these, two advertisements were adapted for all three media as a response to Blue Cross/Blue Shield's most serious criticisms.

The first of these multi-media advertisements—apparently attempting to counter-act the Blue Cross/Blue Shield message that HMO doctors sacrificed quality of care for higher profit—emphasizes the length to which U.S. Healthcare will go to provide its subscribers with the best treatment available. It features an HMO doctor with a little girl who, it quickly becomes apparent, is both very healthy and a former HMO patient. While the exact text varies according to the medium, all versions feature the HMO doctor saying that this girl, who required a unique wrist operation, was sent to Baltimore to be operated on by "the best [surgeon] in the country" rather than one of HMO's fine surgeons.

The second multi-media advertisement addresses HMO's practice of allowing examination by specialists only when the subscriber is referred by his primary care physician. The advertisement features just such a physician, explaining that the purpose of a primary care physician is to help the subscriber decide what type of specialist should be consulted, so that the subscriber can be sure of receiving the treatment he needs. Neither multi-media advertisement makes any reference to Blue Cross/Blue Shield.

U.S. Healthcare's responsive campaign did not just highlight the positive characteristics in its own product, but also featured "anti-Blue Cross" advertisements. Of the three remaining print advertisements, one simply shows a comparative list of the features available under HMO and Personal Choice, with a banner heading that reads "It's your choice." The other two explain that under Personal Choice, the number of hospitals available to the subscriber is limited and, moreover, that many Personal Choice doctors do not have admitting privileges at even those few. One of these advertisements ran under a banner heading of "When it Comes to Being Admitted to a Hospital, There's Something Personal Choice May Not Be Willing to Admit"; the other ran under a banner heading of "If You Really Look Into 'Personal Choice,' You Might Have a Better Name For It."

One of the two remaining television advertisements shows a person flipping

through the Hospitals and Physicians Directory of Personal Choice, pointing out the "gray area" of physicians without admitting privileges—essentially making the same point as the two print advertisements. The final television commercial was U.S. Healthcare's own attempt to play upon the fears of the consuming public. As solemn music plays, the narrator lists the shortcomings of Personal Choice while the camera pans from a Personal Choice brochure resting on the pillow of a hospital bed to distraught family members standing at bedside. The advertisement closes with a pair of hands pulling a sheet over the Personal Choice brochure.

Thereafter, U.S. Healthcare re-filed its state claims in federal court in the Eastern District of Pennsylvania, adding its § 43(a) Lanham Act claim.[6] Federal subject matter jurisdiction was premised on the assertion of a federal question, 28 U.S.C. § 1331 (1982), and on claims of unfair competition, 28 U.S.C. § 1338(a) (1982). Pendant jurisdiction was exercised over the state law claims. Blue Cross/Blue Shield counterclaimed on the same theories of liability, while also alleging abuse of process and malicious use of process. Before trial, the district court dismissed the abuse of process and malicious use of process counts in Blue Cross/Blue Shield's counterclaims.

After a fourteen-day trial, followed by eight days of deliberations, the jury announced it was deadlocked on all issues of liability and damages. The district court declared a mistrial and then, before excusing the jurors, invited them to share their thoughts on the case for the benefit of the lawyers. It became apparent that, with regard to the counterclaims, the jurors were not far from unanimity. Consequently, the district court sent the jury back to deliberate whether Blue Cross/Blue Shield could recover damages on its counterclaims. Only then did the jury return a verdict against Blue Cross/Blue Shield on its counterclaims. The district court thereafter entered judgment for U.S. Healthcare on the counterclaims and scheduled a new trial on U.S. Healthcare's own claims.

The case was never retried. Instead, Blue Cross/Blue Shield filed a motion under Fed.R.Civ.P. 50(b) requesting the court to direct entry of judgment in its favor, on the grounds that the advertisements were entitled to heightened constitutional protection under the First Amendment, and that U.S. Healthcare had not met the applicable standard of proof, set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *et seq.* The district court granted the motion. *U.S. Healthcare, Inc. v. Blue Cross*, No. 86–6452, 1988 WL 21830 (E.D.Pa. Mar. 7, 1988). The court held that because the objects of the advertisements are "public figures," and because the matters in the advertisements are "community health issues of public concern," heightened constitutional protections attach to this speech. The court reasoned that the First Amendment limited the power of the state and of Congress to award damages resulting from the allegedly false and misleading advertisements. Accordingly, the district court held that in order to prevail on their respective claims of Lanham Act violation, commercial disparagement, defamation and tortious interference with contract, both parties were required to prove each claim by clear and convincing evidence: (1) that the other side published the advertisements with knowledge or with reckless disregard of their falsity, and (2) that the advertisements were false. Applying this standard of proof, the court concluded that "[a]lthough the jury could reasonably have concluded that both sides had proven falsity and actual malice by a preponderance of the evidence, neither side has presented clear and convincing evidence [of this]."

This appeal followed.

## II.

## THE ACTIONABLE CLAIMS AND COUNTERCLAIMS UNDER APPLICABLE SUBSTANTIVE FEDERAL AND STATE LAW

We note initially that federal law governs the substantive issues of the parties'

---

**6.** After filing the federal claims, the parties agreed to stay the state court action.

Lanham Act claims, while Pennsylvania law governs the commercial disparagement, defamation and tortious interference with contract claims. Although the district court granted the Rule 50(b) motions on constitutional grounds, we must first determine whether the statements are actionable under the substantive law governing the case before addressing whether the First Amendment prohibits the imposition of liability, since a determination of the former may obviate the need to examine the latter. *See McDowell v. Paiewonsky*, 769 F.2d 942, 945 (3d Cir.1985); *Avins v. White*, 627 F.2d 637, 642 (3d Cir.), *cert. denied*, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 270 (3d Cir.1980). Furthermore, Blue Cross/Blue Shield argues that the "challenged advertisements are not actionable regardless of the standard of proof."[7] Therefore, we turn to the federal and state substantive law governing the parties' claims to determine whether there might exist a genuine issue of material fact.

A. *Applicable Federal and Pennsylvania Common Law.*

As a threshold matter, we note that the burden of proof for the applicable substantive law is a preponderance of the evidence. On appeal, the parties contest the burden of proof on the Lanham Act claim only. Unless *New York Times* applies, the burden of proof here is a preponderance of the evidence.

1. *Section 43(a) of The Lanham Act.*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), which was recently amended, creates a cause of action for any false description or representation of a product.[8] This proscription extends to misleading descriptions or representations. *Id.; see Ames Publishing Co. v. Walker–Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa.1974); *see also McNeilab, Inc. v. Bristol–Myers Co.*, 656 F.Supp. 88, 90 (E.D.Pa.1986). "While it has been stated that a failure to disclose facts is not actionable under § 43(a), it is equally true that a statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of failure to disclose a material fact." 2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7B (2d ed. 1984).

■ The pre-amendment version, which controlled when the district court considered the matter, applied only to statements made by a defendant about its own products, not to statements about the plaintiff's products. *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 37 (2d Cir.1982); *Bernard Food Indus., Inc. v. Dietene Co.*, 415 F.2d 1279, 1283 (7th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970). As amended, however, § 43(a) encompasses statements made by a defendant about "his or her *or another person's*" products. 15 U.S.C.

---

7. The district court denied Blue Cross/Blue Shield's motions for summary judgment.

8. Congress amended the section in 1988, essentially "to codify the interpretation it has been given by the courts." S.Rep. No. 515, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603. The new version, which became effective November 16, 1989, provides:

> (a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Trademark Law Revision Act, Pub.L. 100–667, § 132, 102 Stat. 3946 (1988). The only significant change in the provision, for our purposes, is discussed in the following paragraph.

1125(a) (emphasis added).[9]

When analyzing a challenged advertisement, the court first determines what message is conveyed. *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*, 532 F.Supp. 714, 717 (D.Del.1982); McCarthy § 27:7B. Sometimes this determination may be made from the advertisement on its face. *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1110 (D.N.J.1987); *e.g., Ames Publishing*, 372 F.Supp. at 12. Nonetheless, "[c]ontext can often be important in discerning the message conveyed." *Plough*, 532 F.Supp. at 717.

■ After determining the message conveyed, the court must decide whether it is false or misleading. *Stiffel*, 658 F.Supp. at 1110; McCarthy § 27:7B; *see Plough*, 532 F.Supp. at 717. Mere puffing, advertising " 'that is not deceptive for no one would rely on its exaggerated claims,' " is not actionable under § 43(a). *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 253 n. 23 (D.Del.1980) (quoting 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 19.2(b)(2) (3d ed. 1967 & 1979 Supp.)). If the advertisement is literally true, the plaintiff "must persuade the court that the persons 'to whom the advertisement is addressed' would find that the message received left a false impression about the product." *Id.* at 251 (citation omitted); *see Stiffel*, 658 F.Supp. at 1110. Finally, establishing lack of substantiation of defendant's claim is insufficient without also establishing falsity or deception. *Toro*, 499 F.Supp. at 253.

■ The plaintiff must also show that defendant's misrepresentation is " 'material, in that it is likely to influence the purchasing decision.' " *Id.* at 251 (citation omitted); *see* McCarthy § 27:4D. However, "there is no requirement that the falsification occur wilfully and with intent to deceive." *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958).

■ Next, § 43(a) requires that the defendant use the false or misleading description or representation "in commerce." 15 U.S.C. § 1125(a); *see SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980). The commerce requirement has been broadly interpreted. McCarthy § 27:6C.

■ Finally, § 43(a) provides a remedy to one who "is or is likely to be damaged by [the false or misleading description or representation]." 15 U.S.C. § 1125(a). To recover damages, a plaintiff must show that the "falsification [or misrepresentation] actually deceives a portion of the buying public." *Parkway Baking*, 255 F.2d at 648; *Walker–Davis Publications, Inc. v. Penton/IPC, Inc.*, 509 F.Supp. 430, 435 (E.D.Pa.1981) (citing *Parkway Baking* ). "This does not place upon the plaintiff a burden of proving detailed individualization of loss of sales. Such proof goes to quantum of damages and not to the very right to recover." *Parkway Baking*, 255 F.2d at 648.

Judge Pollak has summarized well this area of the law in the following test:

1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods travelled in interstate commerce; and 5) that there is a likelihood of

---

**9.** This court must "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Although there is no statutory direction, the legislative history, which states that the amendment is intended "to make clear that misrepresentations about another's products are as actionable as misrepresenta-

tions about one's own," would appear to support retroactive application of the new provision. S.Rep. No. 515, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603. Having considered the parties, the nature of their rights and the impact on those rights of this change in law, *Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019, we perceive no threat of manifest injustice and shall apply the provision as it now is written.

injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982) (citing *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165–66 (2d Cir.1978)).

2. *Defamation.*

 Under Pennsylvania law, a defamatory statement is one that " 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 303, 167 A.2d 472 (1960) (quoting Restatement of Torts § 559 (1938)); *accord Thomas Merton Center v. Rockwell Int'l Corp.*, 497 Pa. 460, 464, 442 A.2d 213 (1981), *cert. denied*, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). It is for the court to determine, in the first instance, whether the statement of which the plaintiff complained is capable of a defamatory meaning; if the court decides that it is capable of a defamatory meaning, then it is for the jury to decide if the statement was so understood by the reader or listener. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899 (1971). To ascertain the meaning of an allegedly defamatory statement, the statement must be examined in context. *Baker v. Lafayette College*, 516 Pa. 291, 296, 532 A.2d 399 (1987).

> The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Corabi*, 441 Pa. at 447, 273 A.2d 899 (citation omitted). Opinion that fails to imply underlying defamatory facts cannot support the cause of action. *Baker*, 516 Pa. at 297, 532 A.2d 399.

 In an action for defamation, the plaintiff has the burden of proving 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) an understanding by the reader or listener of its defamatory meaning; and 5) an understanding by the reader or listener of an intent by the defendant that the statement refer to the plaintiff. 42 Pa. Cons. Stat. § 8343(a)(1)–(5) (1988). Additionally, in order to recover damages, the plaintiff must demonstrate that the statement results from fault, amounting at least to negligence, on the part of the defendant. *Geyer v. Steinbronn*, 351 Pa.Super. 536, 554–55, 506 A.2d 901 (1986); *Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 186, 484 A.2d 72 (1984); 42 Pa. Cons. Stat. § 8344 (1988). Finally, the plaintiff has the burden of proving any special harm resulting from the statement. 42 Pa. Cons. Stat. § 8343(a)(6) (1988); *see* Restatement of Torts § 575 comment b (defining special harm).

 The defendant, in turn, can defend against a defamation action by proving the truth of the statement,[10] that the subject matter of the statement was of public concern, or that the occasion on which the statement was made or published was of privileged character.[11] *Spain v. Vicente*, 315 Pa.Super. 135, 140, 461 A.2d 833 (1983); 42 Pa. Cons. Stat. § 8343(b) (1988); *cf. Corabi*, 441 Pa. at 450 n. 6, 273 A.2d 899. When the last of these defenses is raised, the burden shifts to the plaintiff to show abuse of the conditionally privileged occasion. *Baird v. Dun & Bradstreet, Inc.*, 446 Pa. 266, 275, 285 A.2d 166 (1971); *Rutt*, 335 Pa.Super. at 186–87, 484 A.2d 72; 42 Pa. Cons. Stat. § 8343(a)(7) (1988).

---

**10.** *But see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) (in private plaintiff-public issue defamation action against media defendant, there is constitutional requirement to prove falsity of the speech at issue); *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa.Super. 475, 488, 448 A.2d 6 (1982) (Pennsylvania law places burden of proving falsity on plaintiff).

**11.** *See infra* Part III (discussing first amendment privilege).

### 3. *Commercial Disparagement.*

A commercially disparaging statement—in contrast to a defamatory statement—is one "which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, ... if the matter is so understood by its recipient." *Menefee v. Columbia Broadcasting Sys., Inc.*, 458 Pa. 46, 54, 329 A.2d 216 (1974) (quoting Restatement of Torts § 629 (1938)). In order to maintain an action for disparagement, the plaintiff must prove 1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; 2) that no privilege attaches to the statement; and 3) that the plaintiff suffered a direct pecuniary loss as the result of the disparagement. *See Menefee*, 458 Pa. at 53, 329 A.2d 216 (quoting Restatement of Torts introductory note to Chapter 28).

The distinction between actions for defamation and disparagement turns on the harm towards which each is directed. An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant protect an entity's interest in character and reputation. In *Menefee*, the Pennsylvania Supreme Court made the following observation:

> One of the most important purposes for which liability for the publication of matter derogatory to another's personal reputation is imposed is to enable the person defamed to force his accuser into open court so that the accusation, if untrue, may be branded as false by the verdict of a jury. The action for disparagement has no such purpose and cannot be used merely to vindicate one's title to or the quality of one's possessions....

*Id.* (quoting Restatement of Torts introductory note to Chapter 28).

Given the similar elements of the two torts, deciding which cause of action lies in a given situation can be difficult. The Court of Appeals for the Eighth Circuit gave the following time-honored explanation of when impugnation of the quality of goods crosses the line from disparagement of products to defamation of vendors:

> [W]here the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without the aid of extrinsic evidence it imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.

*National Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 771 (8th Cir.), *cert. denied*, 275 U.S. 570, 48 S.Ct. 157, 72 L.Ed. 431 (1927).

An examination of state court decisions indicates that Pennsylvania law tracks the *National Refining* distinction. *See, e.g., Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 319, 182 A.2d 751 (1962) (defamation action lay when competitor's advertisement accused plaintiff of using unnecessary haste and unskilled workmanship in development of customers' film, resulting in its ruin, and implied plaintiff was dishonest in its business practice by inflating prices); *Will v. Press Publishing Co.*, 309 Pa. 539, 544, 164 A. 621 (1932) (defamation action lay for accusation that plaintiff did not pay accounts of his business, as words implied dishonesty); *Pfeifly v. Henry*, 269 Pa. 533, 535, 112 A. 768 (1921) (defamation action lay for statement that plaintiff miller dishonestly weighed flour he sold); *see also Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 271 (3d Cir. 1980) (news report that plaintiff corporation deceived customers as to both price and quality of its product capable of defamatory meaning under Pennsylvania law).

### 4. *Tortious Interference with Contract*

The Restatement of Torts described this tort fifty years ago: "[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a busi-

ness relation with another is liable to the other for the harm caused thereby." Restatement of Torts § 766 (1939). Pennsylvania has adopted this prescription while recognizing two distinct branches of the tort: one concerning existing contractual rights, and another regarding prospective contractual relations.

Regarding existing contractual rights, the Pennsylvania Supreme Court has adopted the test set forth in the Restatement (Second) of Torts:[12]

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

*Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 431, 393 A.2d 1175 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *accord Daniel Adams Assocs., Inc. v. Rimbach Publishing, Inc.*, 360 Pa.Super. 72, 78, 519 A.2d 997 *appeal denied*, 517 Pa. 599, 535 A.2d 1057 (1987). Thus, as a threshold matter, a contract right must be established. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466 (1979). In determining the propriety of the actor's conduct, the court is "guided" by the following factors from the Restatement (Second) of Torts:

(a) The nature of the actor's conduct,

(b) The actor's motive,

(c) The interests of the other with which the actor's conduct interferes,

(d) The interests sought to be advanced by the actor,

(e) The proximity or remoteness of the actor's conduct to the interference and

(f) The relations between the parties.

*Adler, Barish*, 482 Pa. at 433, 393 A.2d 1175.

With respect to prospective contractual relations, the following elements must be demonstrated:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co.*, 488 Pa. at 208, 412 A.2d 466; *accord Vintage Homes, Inc. v. Levin*, 382 Pa.Super. 146, 155, 554 A.2d 989 (1989). The Pennsylvania Supreme Court has defined "prospective contractual relation" as "something less than a contractual right, something more than a mere hope." *Thompson Coal Co.*, 488 Pa. at 209, 412 A.2d 466. In short, it is "a reasonable probability" that contractual relations will be realized. *Id.* (citing *Glenn v. Point Park College*, 441 Pa. 474, 480, 272 A.2d 895 (1971)). Such an expectation may arise from an unenforceable express agreement or an offer. *Glenn*, 441 Pa. at 481 n. 6, 272 A.2d 895. The privilege determination "is not susceptible of precise definition" but is informed by the " 'rules of the game' " and " 'the area of socially acceptable conduct which the law regards as privileged.' " *Id.* at 482, 272 A.2d 895 (citation omitted).

**B.** *The Actionable Construction of the Advertisements*

From the record before us, both U.S. Healthcare and Blue Cross/Blue Shield have taken a broad approach to this litigation, each complaining about all of the advertisements in the other's comparative campaign. Not all of the advertisements are actionable under all of the theories alleged. Therefore, we make the following rulings on which advertisements could be found actionable by a jury under the standards we have outlined.

First, we consider as a group three of Blue Cross/Blue Shield's television adver-

---

**12.** The court quoted language from Restatement (Second) of Torts § 766 (Tent.Draft No. 23, 1977). The final restatement is the same in substance. *See* Restatement (Second) of Torts § 766 (1979).

tisements, which appear to be mere identification pieces containing no substantive information. They feature actors stating either their trust in Blue Cross/Blue Shield, or their preference for Personal Choice over HMO. Additionally, they all feature the slogan "Better than HMO. So good, it's Blue Cross and Blue Shield." This strikes us as the most innocuous kind of "puffing," common to advertising and presenting no danger of misleading the consuming public. Consequently, we find that no cause of action lies with regard to these three advertisements.

Second, we consider as a group U.S. Healthcare's two multi-media advertisements, one which featured an HMO doctor describing U.S. Healthcare's efforts to provide the best possible treatment for a young girl, and the other which featured an HMO primary care physician describing why she helps HMO patients select which specialists to consult. Neither of these advertisements makes any reference to Blue Cross/Blue Shield and, consequently, the only action that may lie based upon them is one for unfair competition under § 43(a) of the Lanham Act.

In this second group of advertisements, which are only actionable (if at all) under the Lanham Act, we include two of Blue Cross/Blue Shield's advertisements. The first is a print advertisement, targeted specifically at Philadelphia School District employees during a period of "Open Enrollment," that describes the features of Personal Choice without reference to HMO. The second is a television commercial. While similar to the three we found to be innocuous, this advertisement goes one step further, factually representing that Personal Choice covers "routine doctor visits, prescriptions, even pediatric care." At trial, testimony was adduced as to just how often Personal Choice would cover checkups and whether these did, in fact, constitute "routine" doctor care. Consequently, we believe there could be a question whether Blue Cross/Blue Shield misrepresented its own product in this advertisement and, hence, it too may give rise to a cause of action under the Lanham Act.

Third, we consider as a group the bulk of the advertisements, which either compare the competing health plans on one or more points, or simply criticize the competitor's health plan without detailed exposition of the advertiser's own competing plan. Because they may contain misrepresentations beyond puffing, a cause of action may lie under the Lanham Act, even for those advertisements that focus exclusively on the competitor's health plan. In addition, as these advertisements all make representations about the competitor's product, a cause of action may lie for commercial disparagement with respect to any of them. None of these, however, could be said to impute to the competitor by fair construction any "fraud, deceit, dishonesty, or reprehensible conduct." *National Refining Co.*, 20 F.2d at 771. Consequently, no cause of action for defamation will lie with regard to these. Finally, to the extent that these advertisements were unprivileged, were intended to interfere with existing or prospective contractual relations and actually did so, an action may lie for tortious interference with contract.

We believe the remaining advertisements are capable of defamatory meaning. These include, first, the Blue Cross/Blue Shield advertisements that suggest HMO primary care physicians have a financial interest in not referring patients to specialists and, indeed, that HMO makes reprisals against those primary care physicians who make too many referrals. These advertisements imply that U.S. Healthcare, the people who run it, and the doctors who are employed by it, all place personal profit above adequate health care. Such an implication goes beyond the comparative quality of HMO health care to suggest reprehensible conduct by U.S. Healthcare and its employees in the conduct of their business.

Also capable of defamatory meaning is Blue Cross/Blue Shield's "Distraught Woman" advertisement. Her statement that "The hospital my HMO sent me to just wasn't enough," matched with her grief-stricken demeanor, suggests she has suffered some tragedy because of HMO's substandard care. The suggestion that U.S. Healthcare chose to send her to a hospital

that could not adequately treat her problem goes beyond the product itself to impute reprehensible conduct to the corporation. Indeed, the scare tactic is the point of the commercial.

Finally, we find U.S. Healthcare's "Critical Condition" television commercial to be capable of a defamatory construction as well. As a dirge plays, the narrator lists the shortcomings of Personal Choice while the camera pans from a Personal Choice brochure resting on the pillow of a hospital bed to distraught family members standing around the bed. At the end of the advertisement, a pair of hands pulls a sheet over the Personal Choice brochure. We do not believe the depiction of a distressing death scene in a health insurance commercial is an uncalculated association. Again, we believe a scare tactic was the intent and, more to the point, a jury could find the commercial suggests Blue Cross/Blue Shield knowingly provides health care so substandard as to be dangerous.[13]

As to this final group of advertisements, no action for commercial disparagement will lie because the statements are directed at the vendor, not his goods. Nonetheless, Lanham Act claims may lie. Moreover, to the extent that these advertisements were unprivileged, were intended to interfere with existing or prospective contractual relations and actually did so, an action may lie for tortious interference with contract.

### III.

### FIRST AMENDMENT PRINCIPLES AND THE STANDARD OF PROOF IN CLAIMS ARISING FROM A COMPARATIVE ADVERTISING CAMPAIGN

Having determined that some of the advertisements may be actionable under federal and state law, we must now consider whether the First Amendment affects the standard of proof. As we have already noted, the district court held that under *New York Times Co. v. Sullivan et seq.* each party must prove as to each claim, by clear and convincing evidence, that the other party acted with actual malice—that is, with knowledge that the advertisement was false or with reckless disregard of whether it was false or not. 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). In so holding, the court rejected U.S. Healthcare's argument that the advertisements were commercial speech and thereby entitled to less constitutional protection. The district court viewed the comparative advertising campaign giving rise to this litigation as a "dispute ... about how best to deal with spiraling medical costs," and concluded that, "[t]o characterize the advertisements in this case as mere commercial speech ignores the fact that, at their core, they are instruments in a debate between two providers of public health care 'intimately involved in the resolution of important public questions.'"

In arguing that the district court erred in applying heightened evidentiary standards to any of its claims, U.S. Healthcare maintains that the *New York Times* standard is "not mandated where, as here, false commercial speech is at issue." In response, Blue Cross/Blue Shield contends that the principles set forth in the commercial speech doctrine are inapplicable to this case because the United States Supreme Court "views damage claims [brought by private citizens] and government restrictions of speech as requiring distinctly different analysis for First Amendment purposes."

### A. *Background*

Distinguishing the Supreme Court's First Amendment jurisprudence is an express in-

---

**13.** The district court charged the jury that any of this last group of advertisements would escape defamation liability if it constituted opinion. The following statement by the Supreme Court, although dicta, is regularly cited for the proposition:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974). Consequently, a statement of pure opinion receives absolute protection under the First Amendment. *Jenkins v. KYW,* 829 F.2d 403, 408 (3d Cir.1987); *Ollman v. Evans,* 750 F.2d 970, 975 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). This matter has not been raised on appeal.

tention to "lay down broad rules of general application," rather than to allow balancing between competing values on a case-by-case basis, an approach that the Court fears would "lead to unpredictable results and uncertain expectations, and ... render [its] duty to supervise the lower courts unmanageable." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343–44, 94 S.Ct. 2997, 3008–09, 41 L.Ed.2d 789 (1974). In delineating the limits placed on state authority by the First Amendment, the Court has articulated two distinct lines of cases, one involving defamation and the other involving government regulation of commercial speech.[14] We have found no decision by the Court considering a defamation action involving expression properly characterized as commercial speech.

Despite its intention to enunciate general rules, the Court has implicitly recognized the need for balancing when a novel issue arises. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (applying balancing test to determine whether private plaintiff or media defendant bears burden of proving falsity). Given the unique issue presented here, we believe it is necessary to evaluate the competing state and First Amendment interests. In taking this approach, we are mindful of the Supreme Court's admonition that nothing in *Gertz* "indicated that [the] same balance would be struck regardless of the type of speech involved." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756–57, 105 S.Ct. 2939, 2943–44, 86 L.Ed.2d 593 (1985) (plurality opinion) (footnote omitted).

Our approach will proceed in light of the analytical framework of the defamation cases. We have found no comparable case, and the parties cite none. In what we believe is a matter of first impression, we are presented with the unique circumstance of allegedly defamatory statements made in the context of a comparative advertising campaign.

## B. *Rules and Conceptual Framework*

Most speech is protected by the First Amendment. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984) (there are "few classes of 'unprotected' speech"). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07 (footnote omitted), *quoted in Jenkins v. KYW*, 829 F.2d 403, 408 (3d Cir.1987). Even false statements of fact are insulated from liability in some situations.[15] *Hepps*, 475 U.S. at 778, 106 S.Ct. at 1564; *Gertz*, 418 U.S. at 340–41, 94 S.Ct. at 3007–08. As Judge Learned Hand put it, the First Amendment " 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.' " *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943), *aff'd*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)).

Although speech is generally protected, the Supreme Court has "long recognized that not all speech is of equal First Amendment importance. It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.' " *Dun*

---

**14.** The First Amendment applies to the states through the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964) (citing *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925)).

**15.** In the context of government restriction of speech, false and misleading commercial speech have no First Amendment value. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,*

447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity"). Similarly, in the context of defamation, false statements of fact have "no constitutional value." *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007. As we shall see, however, such speech sometimes warrants First Amendment protection in this context.

*& Bradstreet*, 472 U.S. at 758–59, 105 S.Ct. at 2944–45 (footnote and citations omitted). Such speech—unlike expression that is " 'no essential part of any exposition of ideas, and [is] of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality,' " *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942))—requires heightened constitutional protection in the defamation context.

Our brief review of the cases in this area must begin with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Since 1964, the Court has extended constitutional protection to defamatory criticism of public officials in their official capacity, unless those officials can demonstrate that the defamatory statement was made with "actual malice." *Id.* at 279–80, 84 S.Ct. at 725–26. The issue was whether a paid advertisement soliciting funds to support civil rights demonstrations in the South and the defense of Dr. Martin Luther King against a perjury charge lost all constitutional protection because it contained libelous statements which a jury found to have impugned the reputation of the Commissioner of Public Affairs for Montgomery, Alabama. The Court framed the issue as public in nature, describing the advertisement as "an expression of grievance and protest on one of the major public issues of our time." *Id.* at 271, 84 S.Ct. at 721. Against the background of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *id.* at 270, 84 S.Ct. at 721, the Court reasoned that traditional state libel laws "compelling the critic of official conduct to guarantee the truth of all his factual assertions" [16] would "dampen[ ] the vigor and limit[ ] the variety of public debate" by deterring true as well as false speech, *id.* at 279, 84 S.Ct. at 725. Accordingly,

after noting that "erroneous statement is inevitable in free debate," the Court decided "it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *Id.* at 271–72, 84 S.Ct. at 721–22 (citation omitted). The "actual malice" standard was adopted to serve this function.

Over the next two decades, the Court " 'struggle[d] . . . to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment.' " *Hepps*, 475 U.S. at 768, 106 S.Ct. at 1559 (quoting *Gertz*, 418 U.S. at 325, 94 S.Ct. at 3000). During this period, the Court "varied its formulations of underlying policy and . . . first expanded, then shrunk the quantum of deference to First Amendment considerations." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 587 (1st Cir.1980). Nonetheless, at this stage, certain "black letter" rules have emerged. When the plaintiff is a public official or a "public figure" and the speech is of public concern, he must prove by clear and convincing evidence that the defamatory falsehood was made with "actual malice" by a media defendant. *See Gertz*, 418 U.S. at 335–37 & n. 7, 94 S.Ct. at 3005 & n. 7; *see also Hepps*, 475 U.S. at 775, 106 S.Ct. at 1563. In such situations, the plaintiff must prove the falsity of the statements to prevail.[17] *Id.* at 775, 106 S.Ct. at 1563 (citing *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964), and *Herbert v. Lando*, 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979)). When the plaintiff is a private figure but the speech involves a matter of "public concern," the states may define for themselves the appropriate standard of liability; however, they may not impose liability without fault, nor allow presumed or punitive damages without a showing of actual malice. *See Gertz*, 418 U.S. at 347–49, 94 S.Ct. at 3010–12; *see also Dun & Bradstreet*, 472 U.S. at 756, 105 S.Ct. at 2943 (limiting rule of *Gertz* to speech involving issue of public concern). In such instances,

---

16. Under Alabama law, a defendant in a libel action could escape liability by proving the truth of the statements.

17. Because of our disposition in this case, we need not address the necessity for, nor standard of, proof of falsity.

the plaintiff must prove the falsity of the speech to recover damages from a media defendant. *Hepps,* 475 U.S. at 777, 106 S.Ct. at 1564. In contrast, when the plaintiff is a private figure and the speech regards matters of "purely private concern," the plaintiff may prove presumed and punitive damages without a showing of "actual malice." *Dun & Bradstreet,* 472 U.S. at 761, 105 S.Ct. at 2946; *see Hepps,* 475 U.S. at 775, 106 S.Ct. at 1563.

In arriving at these rules, the Court articulated the conceptual framework underlying its decisions. *New York Times,* the Court explained, represents an accommodation between the state interest in protecting the reputations of individuals and the First Amendment interest in safeguarding freedom of speech. *See Dun & Bradstreet,* 472 U.S. at 756–57, 105 S.Ct. at 2943–44; *Gertz,* 418 U.S. at 349, 94 S.Ct. at 3012 ("we are attempting to reconcile state law with a competing interest grounded in the … First Amendment"); *see also Hepps,* 475 U.S. at 773–74, 106 S.Ct. at 1562–63 (implicitly endorsing *Gertz* balancing test).

In evaluating these competing interests, the Court has determined that the state has only a "limited" interest in compensating public persons for injury to reputation by defamatory statements, but has a "strong and legitimate" interest in compensating private persons for the same injury. *See Gertz,* 418 U.S. at 343 & 348–49, 94 S.Ct. at 3008, 3011–12. The Court has provided a two-fold explanation for the discrepancy in the extent of the state interests. First, because public officials and public figures enjoy "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals," the states have a greater interest in protecting private persons whose relative lack of "self-help" remedies render them "more vulnerable to injury." *Id.* at 344, 94 S.Ct. at 3009. Second, the state has a stronger interest in protecting the reputations of private individuals because, unlike public persons, they have not voluntarily placed themselves in the public eye. *Id.* at 344–45, 94 S.Ct. at 3009–10.

On the other side of the coin, the "type of speech involved" also affects the way in which the "balance is struck," by varying the weight of the First Amendment interest.[18] *Dun & Bradstreet,* 472 U.S. at 756–57, 105 S.Ct. at 2943–44; *cf. Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (identifying "sort of expression involved" as relevant for balancing state interests against First Amendment values). "[S]peech on 'matters of public concern' … is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet,* 472 U.S. at 758–59, 105 S.Ct. at 2944–45 (citations omitted). The Court has determined that "speech of private concern," such as a credit report for business, is of less First Amendment importance, *id.* at 757–59, 105 S.Ct. at 2944–45, in the same way that utterances labeled "commercial speech" are "less central to the interests of the First Amendment," *id.* at 758 n. 5, 105 S.Ct. at 2944 n. 5.

### C. *Application of the Rules and Conceptual Framework*

■ At the outset, we note that it is of no consequence that the defendants (and

---

**18.** For fifteen years, the Court fluctuated on the issue whether the nature of the speech involved, in addition to the status of the plaintiff, was a legitimate consideration for triggering heightened constitutional protections. *See Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296 (1971) (plurality opinion) (test for application of actual malice standard turns on "whether the utterance involved concerns an issue of public or general concern"); *Gertz,* 418 U.S. at 346, 94 S.Ct. at 3010 (application of actual malice standard depends solely on status of plaintiff, not nature of speech, because it is unwise to commit "to the conscience of judges" task of determining

"'what information is relevant to self-government'") (quoting *Rosenbloom,* 403 U.S. at 79, 91 S.Ct. at 1837 (Marshall, J., dissenting)); *Dun & Bradstreet,* 472 U.S. at 757 n. 4, 105 S.Ct. at 2944 n. 4 (plurality opinion) (opinion turning on "public issue" test, while denying decision was inconsistent with *Gertz* ). While few generalizations can safely be propounded, with the Court's most recent defamation decision endorsing the *Dun & Bradstreet* approach, it now appears that a majority of the Court agrees that the nature of the speech is always central to determining the accommodation between First Amendment values and state libel laws. *See Hepps,* 475 U.S. at 775, 106 S.Ct. at 1563.

counterclaim defendants) here are not members of the broadcast and print media. Although the Supreme Court has not finally settled whether "non-media" defendants should receive protections identical to those afforded "media" defendants, *see* L. Tribe, *American Constitutional Law,* § 12–13, at 874 n. 9, 876 n. 20 (2d ed.1988),[19] this court has so far declined to limit the protections of the *New York Times* standard to media defendants only, *see Avins v. White,* 627 F.2d 637, 648–49 (3d Cir.) (requiring proof of actual malice when former law school dean sued member of American Bar Association accreditation team for allegedly defamatory remarks made during accreditation evaluation), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980).

In addition, we do not limit our consideration of the applicability of the *New York Times* standard to the parties' claims for defamation alone. The Supreme Court has already applied a similar analysis to other torts, such as intentional infliction of emotional distress, *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988), and "false light," *Time, Inc. v. Hill,* 385 U.S. 374, 390–91, 87 S.Ct. 534, 543–44, 17 L.Ed.2d 456 (1967). *Cf. Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 513, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (in case involving district court conclusion that "the *New York Times* rule should be applied to a claim of product disparagement," the Supreme Court "express[ed] no view on that ruling, but ... accepted it for purposes of deciding th[e] case"). *But see Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 578–79, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977) (First Amendment does not limit state's ability to protect performer's commercial stake in act by allowing damage action for violations of common law "right to publicity").

We next turn to assessing the relative weight of the First Amendment interests in this case. We recognize that traditional defamation analysis usually begins with an examination of the status of the plaintiff. *See, e.g., Hepps,* 475 U.S. at 775, 106 S.Ct. at 1563. Because of the facts presented, however, we shall first consider the content of the speech involved. Nor do we believe that such inverted analysis is improper. *Cf. Hepps,* 475 U.S. at 773–74, 106 S.Ct. at 1562–63 (*Gertz* recognized that state interest in compensating individuals—in addition to First Amendment interest in preventing self-censorship—must be weighed in defamation cases, implying that initial analysis of speech not improper); *Dun & Bradstreet,* 472 U.S. at 756, 105 S.Ct. at 2943 (in *Gertz* "the fact that expression concerned a public issue did not by itself entitle the libel defendant to the constitutional protections of *New York Times,*" implying that initial consideration of expression not improper).

Similarly, traditional defamation analysis would have us consider the public or private nature of the speech in assessing the weight of the First Amendment interests. We believe, however, that the novel facts here require a different approach. Our appraisal of these interests depends on whether the speech at issue can properly be characterized as commercial speech.[20]

---

**19.** *Compare Dun & Bradstreet,* 472 U.S. at 773 & 783–84, 105 S.Ct. at 2952 & 2957–58 (at least one concurring justice and four dissenting justices reject significance of media status) *with Hepps,* 475 U.S. at 777, 106 S.Ct. at 1564 ("a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant").

**20.** Commercial speech was considered to be devoid of First Amendment significance until 1975. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 505, 101 S.Ct. 2882, 2891, 69 L.Ed.2d 800 (1981) (citing *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942)). In 1976, the Court held—in *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)—that speech that does no more than propose a commercial transaction still "enjoys a substantial degree of First Amendment protection." *Metromedia, Inc.,* 453 U.S. at 505, 101 S.Ct. at 2891. The Court explained:

So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free

"There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985). If the speech here is commercial speech, then it likely does not mandate heightened constitutional protection.[21]

We recognize that the Supreme Court cases creating the commercial speech doctrine all involve some form of government regulation of speech and that none involve defamation actions. Further, the focus in the commercial speech cases is on First Amendment protection itself, not the heightened protection afforded by the actual malice standard. However, we believe the subordinate valuation of commercial speech is not confined to the government regulation line of cases.

In *Dun & Bradstreet*, the Court held that speech on matters of private concern, such as a credit report for business, receives less First Amendment protection than speech on matters of public concern. 472 U.S. at 757–59, 105 S.Ct. at 2944–45. More significantly for our purposes, the Court justified its decision to allow less protection for speech of private concern by drawing an analogy to the reduced First Amendment protection afforded commercial speech:

> This Court on many occasions has recognized that certain kinds of speech are less central to the interests of the First Amendment than others.... In the area of protected speech, the most prominent example of reduced protection for certain kinds of speech concerns commercial

speech. Such speech, we have noted, occupies a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 444] (1978). It also is more easily verifiable and less likely to be deterred by proper regulation. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–772 [96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346] (1976). Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression. *Ohralik, supra* [436 U.S.] at 456 [98 S.Ct. at 1918]; *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 562–563 [100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341] (1980).

*Id.* at 758 n. 5, 105 S.Ct. at 2944 n. 5.

Similarly, the *New York Times* decision indicated that the importance of the First Amendment interests in defamation actions would be reduced in the commercial speech context. In that case, the Court considered the contention that "the constitutional guarantees of freedom of speech ... are inapplicable here ... because the allegedly libelous statements were published as part of a paid, 'commercial' advertisement."[22] *New York Times*, 376 U.S. at 265, 84 S.Ct. at 718. While the Court ultimately determined that the speech was properly characterized as an "editorial" rather than a "commercial" advertisement and therefore deserving of heightened constitutional protection, *id.* at 266, 84 S.Ct. at 718, its analysis indicates that commercial speech, in a libel suit, would receive some, albeit

flow of commercial information is indispensable.... And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. *Virginia Pharmacy Bd.*, 425 U.S. at 765, 96 S.Ct. at 1827 (citations omitted).

21. Although we can "contemplate public controversies arising from commercial conduct" that might necessitate a different result, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d

583, 590–91 (1st Cir.1980), we do not find that here.

22. In so arguing, Sullivan relied on *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), which held that commercial speech receives no constitutional protection. As noted, not until a decade after *New York Times* did the Court expressly extend First Amendment protection to commercial speech. *See Virginia Pharmacy Bd.*, 425 U.S. at 755–70, 96 S.Ct. at 1822–30.

less than heightened, constitutional protection.

Before proceeding further, we must consider what qualifies as "commercial speech." Since deciding *New York Times,* the Supreme Court has provided substantial guidance.[23] Commercial speech may be broadly defined as expression related to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services. *See Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66–67, 103 S.Ct. 2875, 2879–80, 77 L.Ed.2d 469 (1983); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980). The Supreme Court has cited three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech. *Bolger,* 463 U.S. at 66–67, 103 S.Ct. at 2879–80. An affirmative answer to all three questions provides "strong support" for the conclusion that the speech is commercial. *Id.* at 67, 103 S.Ct. at 2880; *accord American Future Sys., Inc. v. Pennsylvania State Univ.,* 752 F.2d 854, 862 (3d Cir.1984), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985). Stated succinctly, the "commercial speech doctrine rests heavily on 'the common sense distinction between speech proposing a commercial transaction ... and other varieties of speech.'" *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985) (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978)).

The Court has elaborated on the reasons why commercial speech receives less than heightened protection. First, commercial speech generally makes a different contribution to the exposition of ideas.[24] *Compare Dun & Bradstreet,* 472 U.S. at 762,

23. As we have noted, the Supreme Court cases on commercial speech all involve some form of government regulation of speech. *See, e.g., Posadas de Puerto Rico Assocs. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (Puerto Rican statute prohibiting local casinos from advertising their gambling facilities to Puerto Rican residents); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (regulation of attorney advertisements by state bar association); *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (federal statute prohibiting mailing of unsolicited advertisements for contraceptives); *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (regulation of attorney advertisements by state supreme court); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (city ordinance prohibiting "off-premise" advertising, unless permitted by one of twelve specified exceptions); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (state statute prohibiting utility company advertisements promoting use of electricity); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (state statute prohibiting the practice of optometry under a trade name); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (state-authorized bar association regulation of in-person solicitation of clients by attorney); *Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (state supreme court rule prohibiting attorneys from advertising); *Linmark Assocs., Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (town ordinance prohibiting posting of real estate "For Sale" and "Sold" signs); *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (state statute declaring advertisement of prescription drug prices by licensed pharmacist to be unprofessional conduct); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (Virginia statute making it a misdemeanor, by sale or circulation of any publication, to encourage procurement of abortion); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (city ordinance prohibiting sex discrimination applied to newspaper employment advertisements published under headings designating job preference by sex); *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (municipal ordinance forbidding street distribution of printed handbills bearing commercial advertising).

24. At the same time, we recognize that commercial speech "is indispensable to the proper allocation of resources in a free enterprise system [and therefore] to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Virginia Pharmacy Bd.,* 425 U.S. at 765, 96 S.Ct. at 1827. Moreover, as we have noted, we can envision advertising that would address public issues in such a way as to necessitate heightened protection. *Cf. New York Times,* 376 U.S. at 266, 84 S.Ct. at 718.

105 S.Ct. at 2947 (holding private speech of reduced constitutional dimension partly because it was "solely in the individual interest of the speaker and its specific business audience") (citing *Central Hudson*, 447 U.S. at 561, 100 S.Ct. at 2349) *with Central Hudson*, 447 U.S. at 561, 100 S.Ct. at 2349 (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience"). In short, "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising...." *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350.

Second, commercial speech tends to be more durable than other types of speech. As the commercial speaker has an economic self-interest in dissemination, there is little likelihood of the speech being chilled by proper regulation. *Id.* at 564 n. 6, 100 S.Ct. at 2350 n. 6; *Bates v. State Bar*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2708, 53 L.Ed.2d 810 (1977). This attribute, the Court concluded, "may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker." *Virginia Pharmacy Bd.*, 425 U.S. at 772 n. 24, 96 S.Ct. at 1381 n. 24; *see Dun & Bradstreet*, 472 U.S. at 758 n. 5, 762 & n. 8, 105 S.Ct. at 2944 n. 5, 2946 & n. 8 (discussing durability "to show how many of the same concerns that argue in favor of reduced constitutional protection" in regulation of commercial speech actions apply to defamation actions involving private speech).

Third, commercial speakers have extensive knowledge of both their market and their own products. Consequently, they are uniquely situated to evaluate the truthfulness of their speech. *Central Hudson*, 447 U.S. at 564 n. 6, 100 S.Ct. at 2350 n. 6; *Bates*, 433 U.S. at 381, 97 S.Ct. at 2708; *see*

*Virginia Pharmacy Bd.*, 425 U.S. at 772 n. 24, 96 S.Ct. at 1831 n. 24; *see also Dun & Bradstreet*, 472 U.S. at 758 n. 5, 762 & n. 8, 105 S.Ct. at 2944 n. 5, 2946 & n. 8 (discussing objective verifiability "to show how many of the same concerns that argue in favor of reduced constitutional protection" in regulation of commercial speech actions apply to defamation actions involving private speech).

The fourth reason is extrinsic. "To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech." *Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918.

In this case, affirmative answers to all three prongs of the *Bolger* test provide "strong support" for our conclusion that the statements here are commercial in nature. First, there is no question that they are advertisements; they were disseminated as part of an expensive, professionally run promotional campaign.[25] Second, the speech specifically refers to a product; it touts the relative merits of Personal Choice (or U.S. Healthcare's HMO) over competing products. Third, the desire for revenue motivated the speech; the record contains abundant evidence that Blue Cross/Blue Shield launched the promotional campaign in order to recoup its share of the health insurance market. The trial testimony of Blue Cross/Blue Shield's president plainly states that the aggressive Personal Choice promotional campaign was developed for the express purpose of competing with HMOs. Moreover, Blue Cross/Blue Shield concedes that it developed a series of advertisements to introduce and increase the

---

**25.** That these are advertisements, while a fact that supports the conclusion they should receive less First Amendment protection under *Bolger*, is not by itself dispositive. *New York Times*, 376 U.S. at 266, 84 S.Ct. at 718 ("if the allegedly libelous statements would otherwise be constitutionally protected from [a defamation] judgment, they do not forfeit that protection because they were published in the form of a paid advertisement") (footnote omitted). Rather, the significance of speech as advertisement is that "advertising is the *sine qua non* of commercial

profits." *Virginia Pharmacy Bd.*, 425 U.S. at 772 n. 24, 96 S.Ct. at 1831 n. 24. *Compare New York Times*, 376 U.S. at 266, 84 S.Ct. at 718 (advertisement soliciting financial support for political cause "not a 'commercial' advertisement") *with Zauderer*, 471 U.S. at 637 & n. 7, 105 S.Ct. at 2274 & n. 7 (advertisement containing information that, in another context would be fully protected, nonetheless commercial speech, as it proposed commercial transaction in advertiser's self-interest).

attractiveness of its products. Similarly, protection of its new market share motivated U.S. Healthcare's speech. In short, "common sense" informs us that the statements here propose a commercial transaction, and thus differ from other types of speech.

Even more importantly, we find it significant that the advertisements have all of the characteristics that the Supreme Court has identified in the commercial speech cases as making speech durable, not susceptible to "chill." Consequently, they do not require the heightened protection we extend to our most valuable forms of speech. Because the thrust of all of the advertisements is to convince the consuming public to bring its business to one of these health care giants rather than the other, there is no doubt that the advertisements were motivated by economic self-interest. Furthermore, given the size of the health care market in the Delaware Valley—Blue Shield virtually shouts about the hundreds of millions of dollars at stake—we believe it would have to be a cold day before these corporations would be chilled from speaking about the comparative merits of their products. *Cf. Dun & Bradstreet*, 472 U.S. at 762–63, 105 S.Ct. at 2946–47 (because credit report was solely motivated by profit "any incremental 'chilling' effect of libel suits would be of decreased significance").

In addition, these are advertisements for products and services in markets in which U.S. Healthcare and Blue Cross/Blue Shield deal—and, presumably, know more about than anyone else. *Virginia Pharmacy Bd.*, 425 U.S. at 772 n. 24, 96 S.Ct. at 1831 n. 24. The facts upon which the advertisements are based—comparative price, procedures, and services offered—are readily objectifiable. These advertisements were precisely calculated, developed over time and published only when the corporate speakers were ready. Consequently, the advertisements were unusually verifiable.

Finally, while the speech here does discuss costs and consequences of competing health insurance and health care delivery programs, some of the advertisements capable of defamatory meaning here add little information and even fewer ideas to the marketplace of health care thought.[26] The expression in these advertisements "differs markedly from ideological expression because it is confined to the promotion of specific ... services." *Virginia Pharmacy Bd.*, 425 U.S. at 780, 96 S.Ct. at 1835. *Cf. Zauderer*, 471 U.S. at 637 & n. 7, 105 S.Ct. at 2274 & n. 7 (advertisement containing information that, in another context would be fully protected, nonetheless commercial speech, as it proposed commercial transaction in advertiser's self-interest). And to the extent that the advertisements are false statements of fact, of course, the speech has no constitutional value at all. *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350.

It is important to note that we do not have a situation in which a corporation addresses an issue of public concern involving a competitor, but does so with speech that is neither commercial nor chill resistant. We simply recognize here, as the Court has in a similar context, that "[a] company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar protection when such statements are made in the context of commercial transactions." *Bolger*, 463 U.S. at 68, 103 S.Ct. at 2881 (footnote omitted).

Despite these conclusive indications that the speech here is commercial in nature, Blue Cross/Blue Shield argues that the speech should be accorded heightened constitutional protection. Relying on *Bigelow*

---

26. We believe one such advertisement implicates important health care concerns. This advertisement suggests that HMO primary care physicians have a financial incentive to deny referrals to specialists. On the other hand, we believe the other advertisements capable of defamatory meaning make no such contribution. One portrays a woman grieving that the hospital to which HMO sent her was inadequate. The second, a "death" scene, shows a pair of hands pulling a hospital sheet over a personal choice brochure as a dirge plays. "There is simply no credible argument that this type of [advertisement] requires special protection to ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'" *Dun & Bradstreet*, 472 U.S. at 762, 105 S.Ct. at 2947 (quoting *New York Times*, 376 U.S. at 270, 84 S.Ct. at 720).

*v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), it argues that speech which does more than "simply propose a commercial transaction" constitutes something more than commercial speech. Furthermore, it maintains that the *"Bigelow* standard" is applicable when the products are not merely linked to a public debate but are themselves "at the center of the public debate." [27] Blue Cross/Blue Shield concludes that its own advertisements "educate[d] the public about the substantial differences among the[ ] available means for financing and delivering health care, thereby ensuring informed purchasing decisions" and rendering the advertisements non-commercial.

Notwithstanding Blue Cross/Blue Shields's call for application of the *"Bigelow* standard," we believe the *Central Hudson* decision, in which the Supreme Court expressly rejected such attempts to "blur further the line the Court has sought to draw in commercial speech cases," 447 U.S. at 563 n. 5, 100 S.Ct. at 2349 n. 5, represents the proper approach. *Central Hudson* prevents an advertiser from immunizing, in effect, otherwise defamatory speech—behind the actual malice standard afforded to core speech by the First Amendment—simply by reference to an issue of public concern.

In *Central Hudson*, the Court held that a regulation by a state public utility commission which prohibited an electric utility from advertising to promote the use of electricity constituted an improper regulation of commercial speech in violation of the First Amendment. In a concurring opinion, Justice Stevens maintained that the regulation at issue encompassed more than mere "commercial speech" because it would stifle, for example, advertising that promoted consumption of electricity by touting its environmental benefits, and thus would "curtail[ ] expression by an in-

formed and interested group of persons of their point of view on questions relating to the production and consumption of electrical energy—questions frequently discussed and debated by our political leaders." 447 U.S. at 581, 100 S.Ct. at 2359 (Stevens, J., concurring). The *Central Hudson* majority was unconvinced:

> Apparently the [concurring] opinion would accord full First Amendment protection to all promotional advertising that includes claims "relating to ... questions frequently discussed and debated by our political leaders." ...
>
> Although this approach responds to the serious issues surrounding our national energy policy as raised in this case, we think it would blur further the line the Court has sought to draw in commercial speech cases. It would grant broad constitutional protection to any advertising that links a product to a current public debate. But many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or *individual health and safety.* We rule today in *Consolidated Edison Co. v. Public Service Comm'n.,* [447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980)], that utilities enjoy the full panoply of First Amendment protections for their direct comments on public issues.
> *There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions.*

*Central Hudson*, 447 U.S. at 562 n. 5, 100 S.Ct. at 2349 n. 5 (emphasis added).

Similarly, in *Bolger*, the Court held "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger*, 463 U.S. at 68, 103 S.Ct. at 2881 (quoting *Central Hudson*, 447 U.S. at 563 n. 5, 100 S.Ct. at

**27.** In *Bigelow,* a newspaper editor published an abortion clinic's advertisement, which the state court determined violated a state criminal statute prohibiting dissemination of publications encouraging the processing of an abortion. The Supreme Court struck down the statute on First Amendment grounds, 421 U.S. at 818–22, 95

S.Ct. at 2230–33, stating that the advertisement could not be regulated as commercial speech because, "[v]iewed in its entirety, [it] conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered ...," *id.* at 822, 95 S.Ct. at 2232.

2349 n. 5). Reasoned the Court: "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.*

Finally, in *Zauderer,* the Supreme Court reiterated its holding that commercial advertisements do not qualify for heightened First Amendment protection simply because they include statements about issues of public debate and concern. *Zauderer* was a lawyer sanctioned by the disciplinary committee of the state supreme court for running deceptive newspaper advertisements for his services. Because some of the advertisements, which publicized the lawyer's willingness to represent women who had suffered injuries resulting from their use of the Dalkon Shield contraceptive device, contained statements regarding the legal rights of persons injured by the Dalkon Shield, the Supreme Court recognized that such statements *"in another context,* would be fully protected speech." 471 U.S. at 637 n. 7, 105 S.Ct. at 2274 n. 7 (emphasis added). "That this is so," the Court concluded, "does not alter the status of the advertisements as commercial speech." *Id.* The Court then restated its position that "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Id.* (quoting *Central Hudson,* 447 U.S. at 563 n. 5, 100 S.Ct. at 2349 n. 5).

We find no principled distinction between the products in *Central Hudson* and those at issue here. Like the energy products advertised in *Central Hudson,* the products advertised here—health care insurance and delivery—are at the center of public debate. Consequently, while we agree that the quality, availability, and cost of health care are among the most important and debated issues of our time, these particular advertisements for specific health care products do not escape the commercial speech category. We conclude, as did the *Zauderer* Court, that whatever the precise boundaries of the "category of expression that may be termed commercial speech, ... it is clear enough that the speech at issue in this case—advertising pure and simple—falls within those bounds." 471 U.S. at 637, 105 S.Ct. at 2274.

Therefore, while the speech here is protected by the First Amendment, we hold that the First Amendment requires no higher standard of liability than that mandated by the substantive law for each claim. The heightened protection of the actual malice standard is not "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988).

Having concluded that the speech here is commercial speech that does not warrant heightened constitutional protection, we nonetheless proceed to consideration of the nature and weight of the state's interest in compensating individuals for injuries resulting from each of the distinct torts alleged. We have previously discussed the state and federal interests implicated. As we shall see in this case, however, traditional defamation analysis is not well suited to strike the proper balance between the state and federal interests and First Amendment values in the context of commercial speech.

 In weighing the state interest, we must look to the status of the claimants. *See Gertz,* 418 U.S. at 342–45, 94 S.Ct. at 3008–10; *see also Dun & Bradstreet,* 472 U.S. at 756, 105 S.Ct. at 2943. As we have noted, the Court has determined that the state has only a "limited" interest in compensating public persons for injury to reputation but has a "strong and legitimate" interest in compensating private persons for the same injury. *See Gertz,* 418 U.S. at 343 & 348–49, 94 S.Ct. at 3008, 3011–12. Contending that the actual malice standard applies because a public figure is implicated, Blue Cross/Blue Shield argues that the following factors render U.S. Healthcare a "public figure": it has voluntarily exposed itself to public comment on the issues involved in this dispute; it is a contributor to the ongoing debate concerning health care insurance; it is among the nation's largest

providers of HMO-type insurance coverage; it markets its products extensively and aggressively, and has a substantial annual advertising budget; and it frequently and consistently asserts the advantages of its method of health care financing and delivery, and has done so in advertisements, press releases, professional journals, newspapers, magazines and speeches before public assemblies. These activities, Blue Cross/Blue Shield submits, "constitute a voluntary effort to influence the consuming public." Similar statements can be made regarding Blue Cross/Blue Shield.

*Gertz* identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are "exceedingly rare"; and those who are deemed public figures only within the context of a particular public dispute. *Id.* at 345, 94 S.Ct. at 3009. The Court defined the last group, limited purpose public figures, as individuals who voluntarily "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.*

At the outset, we note that "the classification of a [claimant] as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court." *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1081 n. 4 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985). Because neither claimant explicitly classified the other as a full purpose or involuntary public figure, the issue is whether either constitutes a limited purpose public figure.

Generally, two factors inform this determination. The first factor indicative of a claimant's status is his relative access to the media. Clearly, both parties have access to the media. Moreover, the magnitude of the advertising campaigns shows their ability to utilize it on a vast scale. While access to the media does not always make one a public figure for purposes of First Amendment analysis,[28] the tremendous ability of these parties to advertise, indicating their lack of vulnerability, would support a finding that both are public figures.

The second factor is the manner in which the risk of defamation came upon them. Both companies, attempting to influence consumers' decisions, have thrust themselves into the controversy of who provides better value in health care delivery and insurance. Blue Cross/Blue Shield began the comparative advertising war with its pointed attacks on HMO. U.S. Healthcare, even before responding with its own comparative advertising, had used advertising to help establish itself as a leading provider of health care in the Delaware Valley. Consequently, by inviting comment and assuming the risk of unfair comment, both claimants resemble public figures. *See Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 274 (3d Cir.1980) ("In short, through its advertising blitz, [the plaintiff corporation] invited public attention, comment and criticism.").

Under traditional defamation analysis, the parties' considerable access to the media and their voluntary entry into a controversy are strong indicia that they are limited purpose public figures.[29] Indeed, inflex-

---

**28.** If access to the media were the sole criterion, then Mary Alice Firestone—who held press conferences during her divorce proceedings—would have been a public figure. The Court held that she was not:

> Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters converts her into a "public figure." ... [T]here is no indication that she sought to use the press conference as a vehicle by which to thrust herself to the forefront of some unrelated controversy in order to influence its resolution.

*Time, Inc. v. Firestone,* 424 U.S. 448, 454 n. 3, 96 S.Ct. 958, 965 n. 3, 47 L.Ed.2d 154 (1976) (citing *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009).

**29.** Indeed, we have held a corporation with such characteristics a limited purpose public figure. *See, e.g., Steaks,* 623 F.2d at 272. In *Steaks,* a corporation which had been selling discount meat from booths in Pittsburgh-area department stores brought a defamation action against a Pittsburgh television station for a report it aired. The news report claimed that the corporation was misrepresenting the price and quality of its beef. Noting that the corporation

ible application of these factors would warrant a finding of public figure status and facilitate a finding of heightened constitutional protection. Nonetheless, we hold that these corporations are not public figures for the limited purpose of commenting on health care in this case.[30]

As noted, *Gertz* defines the limited purpose public figure as one who has "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. at 3009. Although some of the advertisements touch on matters of public concern, their central thrust is commercial. Thus, the parties have acted primarily to generate revenue by influencing customers, not to resolve "the issues involved."

While discerning motivations of the speaker is often difficult, we have a more fundamental reason for declining to find limited purpose public figure status in this case. The express analysis in *Gertz* is not helpful in the context of a comparative advertising war. Most products can be linked to a public issue. *See Central Hudson*, 447 U.S. at 563 n. 5, 100 S.Ct. at 2350 n. 5. And most advertisers—including both claimants here—seek out the media. Thus, it will always be true that such advertisers have voluntarily placed themselves in the public eye. It will be equally true that such advertisers have access to the media. Therefore, under the *Gertz* rationale, speech of public concern that implicates corporate advertisers—i.e., typical comparative advertising—will always be in-

sulated behind the actual malice standard. *Cf. Curtis Publishing Co. v. Butts*, 388 U.S. 130, 134–35 & 162–65, 87 S.Ct. 1975, 1980–81 & 1995–97, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring). We believe a corporation must do more than the claimants have done here to become a limited purpose public figure under *Gertz*.[31]

In summary, we conclude that the speech at issue does not receive heightened protection under the First Amendment. Because this speech is chill-resistant, the *New York Times* standard is not, as we have noted, "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988). Therefore, the standard of proof needed to establish the substantive claims is that applicable under federal and state law.

For these reasons, we hold that the district court erred in applying the *New York Times* standard to the claims in this case and in directing entry of judgment under Fed.R.Civ.P. 50(b). Accordingly, we will reverse the judgment of the district court and remand for proceedings consistent with this opinion.

## IV.

### THE JURY ISSUE

■ Blue Cross/Blue Shield contends that the district court erred by requiring the jury to continue to deliberate after indications that it was deadlocked, and by reconstituting the jury after the court had

had, "through its advertising blitz, ... invited public attention, comment, and criticism," *id.* at 274, and that the beef had aroused numerous complaints from area customers, *id.*, we held the corporation a public figure, *id.* at 272.

*Steaks* does not control our decision here, however. *Steaks* involved a consumer reporter's statement, not a comparative advertising campaign. The parties apparently conceded that the news broadcast addressed a matter of public concern, and the court concurred, disposing the issue in a brief phrase. *Id.* In its conclusion, the court was careful to state that its decision reflected the need to protect such speech:

Regardless whether particular statements made by consumer reporters are precisely ac-

curate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster ... First Amendment goals....
*Id.* at 280. Clearly, the statements in *Steaks* did not constitute commercial speech.

**30.** Our holding comports with the Supreme Court's reluctance to "constitutionalize the entire common law of libel." *Dun & Bradstreet*, 472 U.S. at 761 n. 7, 105 S.Ct. at 2946 n. 7.

**31.** We find it significant that the Supreme Court recognized in *Gertz* that "it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority." 418 U.S. at 344, 94 S.Ct. at 3009.

declared a mistrial and held an open-court colloquy with the jurors.

### A.

The jury deliberated for eight days in this case. During that period, on four different occasions it sent notes to the court stating that it was deadlocked. On the morning of the eighth day, after the jury had sent the third of these notes, the court delivered a modified *Allen* charge,[32] properly instructing the jury:

> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

> Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.

> In your deliberations do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of any comments made by the Court or because of any opinion of your fellow jurors or for the mere purpose of returning a verdict.

Approximately two hours later, the jury sent its fourth note to the court, which stated, "[w]e are unable to reach a unanimous decision on question 1 [sic] of the charge." At that point, the district court recalled the jury, declared a mistrial and told the jury "[t]his trial is over; you can sit back and relax." Then, however, the district court made the following request of the jury:

> It might be helpful to the lawyers to know what your thoughts were about the case if you wish to express them. You shouldn't feel any pressure but it might be interesting for the lawyers to know what your problems with the case were on one side or the other.

Thereupon, a lively colloquy ensued in open court for approximately forty-five minutes, during which several jurors gave lengthy explanations of their thoughts and how the jury had proceeded through its deliberations. At one point, the district court specifically inquired as to the numerical division of the jury.

Eventually, it became clear that at least four of the eight jurors agreed on Interrogatory 1B, which asked whether Blue Cross/Blue Shield could recover from U.S. Healthcare on any of its counterclaims. In view of this, U.S. Healthcare's attorney made a motion for the jury to be reconstituted to see if it could reach a verdict on Interrogatory 1B only. Despite the fact that no clear agreement among all of the jurors had been revealed and, more importantly, that the jurors had engaged in the colloquy on the understanding that the trial was over, the district court vacated his declaration of a mistrial and instructed the jury to retire once again to see if it could reach a verdict on Interrogatory 1B. Within ten minutes, the jury returned a verdict in favor of U.S. Healthcare and against Blue Cross/Blue Shield on Interrogatory 1B.

### B.

Our review of Blue Cross/Blue Shield's contention that the jury was coerced requires that we consider the supplemental communication between the district court and the jury "in its context and under all the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (per curiam). We do not believe that the jury was misled by the district court's supplemental instructions. However, we believe that the jury was improperly reconstituted and, therefore, we will vacate entry of judgment against Blue Cross/Blue Shield on its counterclaims.

This was a lengthy and contentious trial and, as in all trials of this nature, it was

---

32. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The Supreme Court recently reaffirmed *Allen*'s validity, especially when the charge, as here, does not speak specifi-

cally to minority jurors. *Lowenfield v. Phelps*, 484 U.S. 231, 237–38, 108 S.Ct. 546, 550–51, 98 L.Ed.2d 568 (1988).

proper for the district court to have an interest in bringing the matter to a satisfactory conclusion. Thus, we are sympathetic to the motivations that no doubt led the district judge to reconstitute the jury. Nevertheless, we believe the trial had been terminated. The trial judge had declared a mistrial, and invited and received detailed explanations from the jurors on their respective views. The jurors' responses made clear that no consensus had ever been reached on any of the interrogatories. One of the first jurors to speak stated that "[w]e had to stop because they were never unanimous on all of the elements." When the district court asked the jury specifically whether it would be "useful for you to resume your deliberations with a view of seeing whether you could decide [Interrogatory 1B]," the first juror to answer replied that the "[h]onest opinion of this group is that we reached a point where I doubt if we could agree black was black." Moreover, the jurors shared their thoughts with the court, the attorneys, and their fellow jurors on the understanding that the trial was terminated and they would no longer have to face one another in the jury room. Indeed, there were jurors who took a public stand on the merits of issues about which they were thereafter asked to deliberate. These events having taken place, the jury could not have been reconstituted.

In addition, the trial judge asked the jurors how they were divided. The Supreme Court has cautioned against asking a deadlocked jury how it is divided: "We deem it essential to the fair and impartial conduct of the trial, that the inquiry itself should be regarded as ground for reversal.... [I]n general its tendency is coercive." *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 135, 71 L.Ed. 345 (1926); *accord Virgin Islands v. Romain*, 600 F.2d 435, 436–37 (3d Cir.1979).[33]

Consequently, we will reinstate Blue Cross/Blue Shield's counterclaims.

## V.

## ABUSE OF PROCESS COUNTERCLAIM

Blue Cross and Blue Shield both counterclaimed for abuse of process under Pennsylvania law in response to U.S. Healthcare's original suit in the Court of Common Pleas. On motion by U.S. Healthcare, the district court dismissed the abuse of process counts in their counterclaims in two concurrent orders, citing *McGee v. Feege*, 353 Pa.Super. 595, 510 A.2d 822 (1986); and *Sheridan v. Fox*, 531 F.Supp. 151 (E.D.Pa. 1982). These decisions hold that in order to state a cause of action for abuse of process under Pennsylvania law, the plaintiff must suffer either an arrest or a seizure of property. *McGee*, 353 Pa.Super. at 598, 510 A.2d 822; *Sheridan*, 531 F.Supp. at 154. As neither Blue Cross nor Blue Shield had made such allegations, it seems apparent that lack of an arrest or seizure of property was the district court's basis for dismissing the counterclaims.

After the district court's action, however, the Superior Court's decision in *McGee* was reversed by the Pennsylvania Supreme Court. *McGee v. Feege*, 517 Pa. 247, 535 A.2d 1020 (1987). The Supreme Court expressly rejected the requirement of arrest or seizure of property to maintain an action for abuse of process under Pennsylvania law. *Id.* at 254–59, 535 A.2d 1020.

In these situations, an appellate court usually applies the law in effect at the time it renders its decision. *Bradley v. School Bd.*, 416 U.S. 696, 714, 94 S.Ct. 2006, 2017, 40 L.Ed.2d 476 (1974) (quoting *Thorpe v. Housing Auth.*, 393 U.S. 268, 281, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969)).[34]

---

**33.** Our decision in *United States v. Fiorilla*, 850 F.2d 172 (3d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 492, 102 L.Ed.2d 529 (1988), is not to the contrary. In *Fiorilla* the jury was polled after it had reported reaching a unanimous verdict. As we observed in *Fiorilla,* unlike the trial judge's pre-verdict inquiry in *Brasfield,* jury polling after a verdict is "both a necessary and useful device for preserving a defendant's right

to a unanimous verdict." *Fiorilla*, 850 F.2d at 176 (citing *United States v. Brooks,* 420 F.2d 1350, 1353 (D.C.Cir.1969)).

**34.** We recognize that intervening changes of law are not always applied retroactively to cases on appeal. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987); *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 608, 107 S.Ct. 2022, 2025, 95

Therefore, we will reverse the district court and reinstate the abuse of process counts of the Blue Cross/Blue Shield counterclaims.

## VI.

## CONCLUSION

The parties throughout their briefs raise several other points on appeal. Having considered them, we find they are either rendered moot by our holding or are devoid of merit.

For the reasons discussed, we will reverse and remand for proceedings consistent with this opinion.

Each side to bear its own costs.

L.Ed.2d 582 (1987). Before a court can limit application of a judicial decision to future cases only, it must consider three factors: 1) whether the decision establishes "a new principle of law ... by overruling clear past precedent on which litigants may have relied"; 2) whether retroactive operation comports with the purpose of the underlying rule; and 3) whether retroactive application is inequitable. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). We have considered these factors and find retroactive operation of the new law appropriate in this case.