## Menefee, Appellant, v. Columbia Broadcasting System, Inc.

Argued November 15, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused December 20, 1974.

*Benjamin E. Zuckerman,* with him *Wright, Spencer, Manning & Sagendorph,* for appellant.

*M. Carton Dittman, Jr.,* with him *Tyson W. Coughlin,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellees.

OPINION BY MR. JUSTICE O'BRIEN, October 16, 1974:

Robert Menefee, whose executrix is the appellant here, was for twenty years a radio personality in and around Philadelphia. Since 1960, he was employed by radio station WCAU in Philadelphia, which is wholly owned by the Columbia Broadcasting System, Inc. In the summer of 1967, Menefee, who referred to himself as "opinionated but lovable," conducted a one-man talk show from 7:30 p.m. to 10:00 p.m. daily, in which he discussed topics of public interest or controversy. On August 25, 1967, WCAU, through its general manager, John O. Downey, and its Director, Michael Grant, who is also a Vice President of CBS, Inc., exercised a right to terminate Menefee's employment on thirteen weeks' notice, opting to pay him an additional salary rather than continue him in his position for that period. That same day, Grant informed newsmen that Menefee had been fired "because of poor ratings garnered by his nighttime talk show." Several articles subsequently appeared to the same effect in the Philadelphia magazines and newspapers.

Menefee, on January 16, 1968, filed an action in the Court of Common Pleas of Montgomery County against

CBS, Inc., and Grant, alleging that the statements to newsmen falsely conveyed "to the public and the broadcasting industry that plaintiff was unable to draw an adequate listening audience, was incapable of earning satisfactory ratings for his program and was therefore incompetent in the performance of his assigned broadcasting duties."

The complaint further alleged that, as a result, "plaintiff has been forced to undergo trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome the damage caused by defendants' actions and has suffered extreme mental anguish thereby, all to his great financial loss and damage."

Thereafter, Menefee discovered additional information relating to his discharge by WCAU. In May, 1967, during his talk show, Menefee apparently said something unpleasant about Veterans of Foreign Wars Post 1507 and the Freedoms Foundation. Three officials of the latter organization and the VFW Post Commander soon met with Downey and Grant of WCAU and apparently communicated their displeasure at Menefee's continued employment by that station. In light of this discovery, Menefee, in 1970, filed a second complaint in Montgomery County, alleging, *inter alia*, that the defendants, CBS, Inc., Grant (both already defendants in the 1968 action), Downey, the Freedoms Foundation and three of its officers, and VFW Post 1507 and its Commander had agreed "in various combinations . . . to secure the termination of plaintiff's employment and publicly to issue as the reason therefor plaintiff's alleged inability to secure satisfactory program ratings, thereby maliciously, illegally and unlawfully injuring plaintiff in his profession as a radio broadcast personality."[1] The complaints in the 1970 suit allege

---

[1] *Menefee v. CBS, Inc.*, 94 Mont. Co. L.R. 387 (1972).

that by reason of the conspiracy to injure him in his profession, Menefee "was wrongfully discharged from his employment and caused to undergo severe financial loss, injury, and professional embarrassment as well as difficulty in securing further employment as a radio personality in the Philadelphia area," and that as a result of the conspiracy to interfere with his contract rights, Menefee "has been caused to suffer a loss of his business and occupation as a radio broadcast personality and to suffer great mental anguish, anxiety and depression with consequent injury to his reputation, character and earning capacity, for all of which plaintiff claims general, compensatory and punitive damages."

The two actions were consolidated and pretrial preparation proceeded (apparently largely through the taking of depositions), but Menefee died on November 9, 1971, one day before trial was to begin. Defendants in the 1968 suit then moved for judgment on the pleadings; defendants in the 1970 suit moved for summary judgment. Both motions were based primarily on the ground that the causes of action pleaded did not survive Menefee's death. Menefee's wife, Barbara Menefee, appellant herein, was made executrix of his estate and was substituted as plaintiff.

The trial court held that: (1) the first action (1968) against CBS, Inc., and Grant did not survive Menefee's death by virtue of the Act of April 18, 1949, P. L. 512, art. VI, §601, 20 P.S. §320.601, which provided: "All causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants,"[2] (2) that the part of the second action (1970), which alleged a conspiracy to make the statements charged in the first

---

[2] Now §3371 of the Probate, Estates and Fiduciaries Code.

action, likewise did not survive because a *civil* action for conspiracy required *damage* and the damage could arise only from the defamation and no action would lie for the defamation; and (3) that the part of the second action which alleged (as against CBS, Inc., Downey and Grant) a conspiracy to interfere with contractual relations could not lie because CBS, Inc., under the contract had a legal right to terminate on thirteen weeks' notice and defendants Downey and Grant were merely the agents through which CBS, Inc., acted. Plaintiff was left, therefore, with an action against Freedoms Foundation, VFW, and the officers of those organizations for tortious interference with his contract.

Menefee's executrix appealed the dismissal as to CBS, Inc., Grant and Downey in both actions to the Superior Court, which affirmed in an opinionless, per curiam order. The case now comes to us after we granted appellant's petition for allocatur.

The policy behind the Legislature's decision to exclude actions for slander and libel from those personal actions which survive the death of the plaintiff can be best explained by an examination of the historical origins of those actions of defamation. Both slander and libel are actions arising from, in the words of the heading of Chapter 24 of the Restatement of Torts, "Invasions of Interest in Reputation." One of the purposes behind the imposition of liability for publication of defamatory statements is to enable the person defamed to restore his reputation by forcing his accuser into open court to prove the truth of his accusations. At common law, such actions always abated at death, because, as one analyst has explained: ". . . justice does not require a windfall to the plaintiff's heirs by way of compensation for an injury to him when they have suffered none of their own, together with the contention that since one party is dead and the other necessarily

not disinterested the truth will be difficult to ascertain in court."[3]

Were the causes of action which are the subject of the instant appeals seeking compensation solely for damage to decedent's general reputation, there can be no doubt that both causes of action would abate. There is, however, a separate tort committed by one who disparages a property right of another so as to cause pecuniary loss. Section 624 of the Restatement of Torts sets forth the requirements for this cause of action: "One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus caused."

The general policy considerations which would cause actions for libel or slander to abate at death do not apply to the cause of action for untruthful disparagement. Since it involves redress for actual pecuniary losses rather than simply violations of interest in character or reputation without measurable loss of economic advantage, redress cannot be considered a "windfall." After all, if the tort caused actual pecuniary loss to the deceased plaintiff, then it caused a similar loss to his estate.

Although an action for untruthful disparagement of a property interest resembles actions for defamation, there are several important differences. As the authors of the Restatement of Torts have explained in an introductory note to Chapter 28 of the Restatement: ". . . Liability for disparagement of the property in or the quality of land, chattels or intangible things differs

---

[3] W. Prosser, Law of Torts, §126 at 901.

in several highly important particulars from the liability for the publication of matter which is defamatory to the personal reputation of another. In defamation, truth is a defense required to be proved by the publisher as defendant. In disparagement, the person whose property in goods or the quality of whose goods has been attacked must prove that the disparaging statement of fact is untrue or that the disparaging expression of opinion is incorrect. Again, in defamation, the publisher who seeks protection of a conditional privilege must prove the existence of the facts which create it. In disparagement, the absence of privilege must be proved by the person who seeks to recover the financial loss caused by the disparagement. In defamation, the publication of all libelous communications and of many types of slanderous communications subjects the publisher to liability even though no pecuniary loss or other harm results therefrom. In disparagement, the publisher is not liable unless the disparaging matter has caused financial loss. One of the most important purposes for which liability for the publication of matter derogatory to another's personal reputation is imposed is to enable the person defamed to force his accuser into open court so that the accusation, if untrue, may be branded as false by the verdict of a jury. The action for disparagement has no such purpose and cannot be used merely to vindicate one's title to or the quality of one's possessions. . . ."

The question before us is, do the appellant's complaints make out a cause of action for untruthful disparagement?

In the first cause of action, brought in 1968, it is alleged that the defendants "falsely conveyed . . . to the public and the broadcasting industry that plaintiff was unable to draw an adequate listening audience, was incapable of earning satisfactory ratings for his pro-

gram and was therefore incompetent in the performance of his assigned broadcasting duties."

Section 629 of the Restatement defines "disparagement" to be: "Matter which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, is disparaging thereto, if the matter is so understood by its recipient."

Since the complaint also alleges that Robert Menefee was a successful radio personality, it can fairly be said that he had an intangible property interest in his broadcasting personality and that a statement that his program could no longer attract satisfactory ratings would tend to disparage that property interest.

In order to be able to recover for disparagement of such a property interest, the plaintiff must show that he suffered a direct pecuniary loss as the result of this disparagement. In the words of §632 of the Restatement: "The publication of matter disparaging to another's property in land chattels or intangible things or disparaging to the quality thereof causes financial loss resulting from the impairment of their vendibility if the publication of the disparaging matter is a substantial factor in determining a third person not to buy or lease the thing disparaged."

Thus, appellant must allege and prove that her husband's estate suffered pecuniary loss as the direct result of the impairment of her husband's value to radio stations in the area caused by the defendant's untrue statements. However, she need not prove that a specific radio station refused to hire him because of reports that his ratings had declined. As Comment f to §633 of the Restatement of Torts explained:

"f. Loss caused by prevention of a sale to unknown purchasers. The disparaging matter may, if widely disseminated, cause pecuniary loss by depriving its

possessor of a market in which, but for the disparagement, his land or other thing might with reasonable certainty have found a purchaser. In such case the impossibility or the great difficulty of showing the identity of the particular person or persons who were dissuaded from purchasing the thing by the publication of the disparaging matter makes evidence of the owner's inability to avail himself of a ready market for the thing in question sufficient proof of the loss and often of its extent; indeed, this inability to dispose of readily marketable things is also sufficient evidence that the defamatory matter has come to the knowledge of unknown possible purchasers and has led them to refrain from buying.

"Thus, a tradesman whose goods are denounced as adulterated can prove not only the existence of the pecuniary loss necessary to recovery but also its extent by showing that after the dissemination of the disparaging matter the sales of his goods have fallen off to an extent explainable only as the result of the defamatory publication. . . ."[4]

As for that portion of appellant's 1970 complaint alleging a conspiracy to interfere with Robert Menefee's contractual relationship, the trial court was correct in its decision to dismiss that cause of action insofar as it named CBS, Inc., Downey and Grant as defendants. CBS, Inc., the other party to the contract, had the right to terminate the contract on thirteen weeks' no-

---

[4] Concerning the pecuniary losses suffered as the result of the disparagement, we note that both complaints allege, in the words of the 1968 complaint: "Plaintiff has been forced to undergo trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome the damage caused by defendants' actions and has suffered extreme mental anguish thereby, all to his great financial loss and damage." Emotional distress is not relevant to an action for disparagement. See Comment h to §633 of the Restatement.

tice. Downey and Grant, as employees of the radio station with a privilege to advise the station on handling its employees, were privileged to cause the station to terminate the contract. See §772 of the Restatement of Torts.

Order of the Superior Court at Appeal No. 68-742 reversed. Order of the Superior Court at Appeal No. 70-10184, insofar as it dismisses appellant's cause of action against appellees CBS, Inc., Downey and Grant for interfering with a contractual relationship, affirmed. Insofar as it dismisses appellant's cause of action for conspiracy to disparage Robert Menefee's broadcast personality, order reversed and case remanded to the Court of Common Pleas of Montgomery County for further proceedings consistent with this opinion.

Mr. Justice ROBERTS concurs in the result.

Mr. Chief Justice JONES dissents.

---

CONCURRING OPINION BY MR. JUSTICE MANDERINO:

I concur with the majority that the complaint in this case states a cause of action, and should be remanded. I cannot agree, however, that there is no cause of action in defamation. If a person, prior to death, suffers economic loss from another person's *negligent conduct* or *breach of contract,* his estate may recover that loss. There is no reason for a different result in defamation. If a defamed person suffers an injury to his reputation *which results in economic loss,* prior to that individual's death, his estate should be entitled to recover that loss as in other cases.

The Act of April 18, 1949, P. L. 512, art. VI, §601, 20 P.S. §320.601, should be interpreted to mean that an action in defamation does not survive the death of the defamed person when the injury was to his reputation alone and did not result in economic loss. If the statute is not so interpreted, a serious constitutional issue is

presented because living persons who have been harmed by the economic loss to the defamed person's estate will have no redress for that harm. *See* Pa. Const. art. I, §11.