

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-19-2001

# Neurotron Inc v. Medical Serv Assoc

Precedential or Non-Precedential:

Docket 00-1516

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Neurotron Inc v. Medical Serv Assoc" (2001). *2001 Decisions.* Paper 132.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/132

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-1516

NEUROTRON INC.,
Appellant

v.

MEDICAL SERVICE ASSOCIATION OF PENNSYL VANIA,
INC., t/a Pennsylvania Blue Shield; HIGHMARK, INC.

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil Action No. 98-cv-00157)
District Judge: Honorable Yvette Kane

Argued December 14, 2000

BEFORE: NYGAARD and STAPLETON, Circuit Judges,
and DEBEVOISE,* District Judge

(Opinion Filed: June 19, 2001)

_____

* Honorable Dickinson R. Debevoise, United States District Judge for the
District of New Jersey, sitting by designation.

Andrew W. Barbin
Gleason & Barbin
123 State Street
Harrisburg, PA 17101
 and
Charles I. Artz (Argued)
Charles Artz and Associates
207 State Street
Harrisburg, PA 17101
 Attorneys for Appellant

Thomas E. Wood (Argued)
Keefer, Wood, Allen & Rahal
210 Walnut Street
P.O. Box 11963
Harrisburg, PA 17108
 Attorney for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Neurotron, Inc. ("Neurotron") is a Maryland corporation which manufactures an electrodiagnostic medical testing device known as the Neurometer CPT ("Neur ometer"). Highmark, Inc. ("Highmark")[1] is a Pennsylvania corporation engaged in the operation of nonprofit health care plans. Neurotron alleges that a passage in Highmark's newsletter, Policy Review and News ("PRN"), commer cially disparaged the Neurometer. Highmark successfully moved for summary judgment. Neurotron appeals. We will affirm.

_____

1. At the time of the disputed events, Medical Services Association of Pennsylvania operated under the trade name "Pennsylvania Blue Shield." "Highmark, Inc." is the Pennsylvania corporation formed in 1996 by the consolidation of the former Pennsylvania Blue Shield and Blue Cross of Western Pennsylvania. The parties have stipulated that Highmark is the successor-in-interest to all of its pr edecessor corporations' rights and obligations.

2

I.

The Neurometer tests a patient's ability to per ceive small electrical currents through a procedure known as "current perception threshold" testing ("CPT"). CPT involves connecting electrodes to the surface of the patient's skin and then delivering a series of low-voltage electrical shocks and recording whether the shocks wer e perceived. Through a series of shocks at decreasing voltages, the Neurometer establishes the lowest level of current that the patient is able to feel. It then compares these readings to a database of "normal" readings and delivers a printout that states whether the patient's sensory perception of electrical current is either elevated ("hyperesthesia"), normal, or depressed ("hypoesthesia"). Hyper esthesia and hypoesthesia can be symptoms of numerous medical problems. Neurotron contends that the Neurometer is a useful diagnostic tool because it can detect these symptoms at a very early stage.

Highmark provides nonprofit health insurance programs which cover the medical expenses of Highmark members. Among the services that Highmark excludes fr om payment are services that are experimental or investigational. Its agreement with its members and health car e providers stipulates that Highmark "does not cover services which it determines are Experimental or Investigative in nature because those services are not accepted by the broad medical community as effective treatments." App. III at 298a. That agreement defines "Experimental or Investigative" as follows:

> the use of any . . . procedure . . . which[Highmark],
> relying on the advice of the general medical community
> which includes but is not limited to medical
> consultants, medical journals and/or gover nmental
> regulations, does not accept as standar d medical
> treatment of the condition being treated, or any such
> items requiring federal or other governmental agency
> approval for which approval has not been granted at
> the time the services were rendered.

App. III at 300a.

3

Highmark's Medical Policy Department ("MPD") r eviews developments in health care practice and pr ocedure and makes determinations as to when a new pr oduct or procedure has advanced beyond the experimental or investigational stage and becomes an accepted part of standard medical practice. Highmark's Benefits Utilization Management Department ("BUMD") conducts post-payment audits of health care providers to assur e that their billings to Highmark have been in accordance with the applicable policies and regulations, that services ar e reported and paid accurately, and that unnecessary services ar e not being prescribed.

In October of 1990, Ralph Cohen, Neurotr on's President, wrote to Highmark requesting that the Neur ometer be reviewed and evaluated for coverage. Highmark r eferred the request to the MPD which, pursuant to Highmark's policy, initiated a "consultant review." Thr ee independent neurologists, Drs. Brennan, Jeffries, and Lossing, evaluated the Neurometer and CPT. Based upon the consultant review, Highmark concluded that CPT was investigational in nature and was, therefore, an uncovered service.

In October of 1991, Dr. Jefferson Katims, Neurotron's Director of Research, wrote to Highmark to request again that the Neurometer be reviewed and evaluated for coverage. Dr. Joseph Ricci, Highmark's V ice President for Medical Affairs, responded in November of 1991 that Highmark's opinion remained unchanged and that, consequently, CPT would remain noncover ed.

In 1994, Dr. Katims again wrote to Dr . Ricci to request reevaluation of CPT. Dr. Ricci r eferred the request to the MPD for review by Douglas Worley. W orley solicited advice from Drs. Lossing, Samuels, and Silverman. Based upon the advice of these independent consultants, Highmark concluded that CPT continued to be investigational. Highmark added CPT to Medical Policy Bulletin Z-24 which listed numerous products and procedur es which were not covered because they had been determined to be investigational.

In 1996, Emelie Sconing, Manager of the BUMD, conducted a claims review of certain chir opractors who

4

appeared to be inappropriately billing noncovered CPT as covered nerve conduction velocity tests. She sent the claims files of the providers under investigation to consultants for review. The consultants, Drs. Tar ola and Samuels, concluded that the providers under investigation had actually performed CPT and not nerve conduction velocity tests. Dr. Tarola opined that"CPT is a nonspecific electrodiagnostic procedure that lacks proof of validity and reliability, and has limited clinical utility." App. III at 223a. He concluded that "the CPT's perfor med on the above referenced patients were medically unnecessary because of apparent indiscriminate use of the procedure and its lack of validity, reliability, and clinical utility." Id. at 224a. Dr. Samuels opined that a "CPT test is experimental and of no proven clinical value. It is not a nerve conduction test. All of these claims should be denied." Id. at 225a.

Having concluded that health care providers were submitting claims for covered nerve conduction velocity tests when in fact they were perfor ming noncovered CPT, Sconing asked the MPD to prepare a notice for publication in Highmark's newsletter, PRN, that CPT tests were not permissibly billed as nerve conduction velocity tests. Highmark uses the PRN to communicate medical policies and other information to its participating health care providers.

Worley drafted the requested notice by adopting the language of Dr. Samuels' comments assessing CPT testing. The notice appeared in the February, 1997, edition of the PRN and read, in its entirety, as follows:

> Neuro-selective current per ception threshold test
>
> The neuro-selective current perception threshold test is performed to provide an objective measure of subjective sensation. It requires the patient's conscious perception of the stimulation applied. The neur o-selective current perception threshold test has no proven clinical utility and is not eligible for payment, since it is considered to be investigational.
>
> Use procedure code 95999 to report this service.

The District Court found that although the passage did

not refer specifically to Neurotr on or the Neurometer, there was sufficient evidence for a reasonable factfinder to find that the passage could be understood as referring to the Neurometer. The District Court also found that there was a genuine issue of material fact as to whether the PRN article was false. Summary judgment was granted, however , for three reasons, each of which precluded a recovery for Neurotron: (1) the PRN's statement that CPT had "no proven clinical utility" was not disparaging; (2) Highmark was conditionally privileged to publish the PRN, and Highmark had not abused its privilege; and (3) the r ecord would not support a finding "that Defendants either knew their statement was false or acted in reckless disregard of its falsity . . . ."[2]

## II.

We agree with the District Court that while the summary judgment record may perhaps r eflect a material dispute of fact as to whether the challenged statement was the result of negligence on the part of Highmark, it will not support a finding that this statement was believed by Highmark to be false or made by it with reckless indif ference as to its truth or falsity. We also agree with the District Court that Neurotron, as a matter of law, cannot r ecover in the absence of such a finding.

_____

[2]. The District Court had diversity jurisdiction pursuant to 28 U.S.C. S 1332(a)(1). We have jurisdiction pursuant to 28 U.S.C. S 1291.

We exercise plenary review over a district court's grant of summary judgment and review the facts in the light most favorable to the party against whom summary judgment was entered. See Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 146 (3d Cir. 1993). Summary judgment is proper if ther e is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

6

## A. The Challenged Statement

We begin our analysis by focusing on the challenged statement. Its purpose was to communicate to participating health care providers that payments for CPT would not be reimbursed by Highmark. Understandably, the statement also communicated Highmark's explanation for its no coverage position: in Highmark's opinion, CPT was investigational in the sense that its clinical value had not been proven. While this explanation does not directly state to whom the clinical value of CPT has not been pr oven, the only reasonable inference to be drawn is the medical community. As Highmark stresses, its explanation cannot reasonably be understood as an affirmative assertion that CPT had been established to be without value in the practice of medicine.

## B. The Governing Law

We agree with the parties that Pennsylvania law governs the liability issues in this diversity action. Accor dingly, we are required to predict the law that would be applied by the Supreme Court of Pennsylvania to the facts of this case. See Gruber v. Owens-Illinois Inc., 899 F .2d 1366, 1369 (3d Cir. 1990).

The Supreme Court of Pennsylvania has not decided a "trade libel" or "injurious falsehood" case in over 25 years. So far as we have been able to determine, it has never expressed a view on the dispositive issue her e -- whether the absence of a reasonable basis for a disparaging statement will alone support a recovery in a case of this kind.

When we find ourselves without guidance fr om the highest court of the state whose law applies, we look to the decisional law of the state's intermediate appellate courts, to the decisions of other federal courts interpr eting that state's law, and to decisions from other jurisdictions discussing the relevant issue. Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 406 (3d Cir. 2000). In particular, "[a]n intermediate appellate state court's decision `is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced

7

by other persuasive data that the highest court of the state would decide otherwise.' " Id. (quoting from West v. American Tel. & Tel. Co., 311 U.S. 223, 237 (1940)).

The Superior Court, an intermediate appellate court of Pennsylvania, recently discussed the Pennsylvania law governing "trade libel" or "injurious falsehood" claims in Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company, 761 A.2d 553 (2000). The specific issue involved there was whether the claim alleged was a defamation claim governed by a one-year statute of limitations or a libel claim governed by a two-year statute. After noting that the latter tort was variously referred to as"trade libel," "commercial disparagement," and "injurious falsehood," the Court looked to S 623A of the Restatement (Second) of Torts and described the tort as follows:

> Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in r eckless disregard of its truth or falsity. Restatement (Second) of Torts S 623(A) (1977).

Pro Golf, 761 A.2d at 555-56.

Like the Superior Court in Pro Golf, federal district courts sitting in Pennsylvania have predicted that the Supreme Court of Pennsylvania would look to the Restatement (Second) of Torts to determine the parameters of the tort of injurious falsehood. See Swift Bros. v. Swift & Sons, Inc., 921 F. Supp. 267, 276 (E.D. Pa. 1995); Eagle's Eye, Inc. v. Amber Fashion Shop, Inc., 627 F. Supp. 856, 863 (E.D. Pa. 1985) Zerpol Corp. v. DMD Corp., 561 F . Supp. 404 (E.D. Pa. 1983).

We have been referred to nothing which suggests to us that the Pennsylvania Supreme Court would take any other approach to defining the tort of injurious falsehood than that followed by Pro Golf. Mor eover, even if we did not have the benefit of Pro Golf, we would r each the same conclusion

8

based on the respect the Pennsylvania Supr eme Court has consistently accorded the Restatement (Second) of Torts even in situations in which Pennsylvania common law precedents varied from the Restatement rule. See Gilbert v. Korvette, Inc., 327 A.2d 94, 100 n.25 (Pa. 1974) ("In recent years, this Court has not hesitated to adopt sections of the Restatement (Second) of Torts (1965) when our common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer ."); Walker v. Grand Central Sanitation, Inc., 634 A.2d 237, 244 (Pa. Super. Ct. 1993) ("We are convinced, and therefore hold, that Section 621 of the Restatement (Second) of Torts accurately states the law of Pennsylvania with r egard to damages in cases of slander per se. . . . This is consistent with our Supreme Court's tendency to adopt the Second Restatement of Torts in defamation matters."); Agriss v. Roadway Express, Inc., 483 A.2d 456, 473 (Pa. Super. Ct. 1984) (noting "Pennsylvania's general tendency to follow the Restatement rule in defamation law."); Medico v. Time, Inc., 643 F.2d 134, 138 (3d Cir. 1981) ("Pennsylvania follows the Restatement (Second) of Torts on most matters . . . . We believe it appropriate to accept as the law of Pennsylvania the version of the fair report privilege embodied in the current Restatement.").

Based on the foregoing, we predict that the Supreme Court of Pennsylvania would apply Sections 623A and 626 of the Restatement (Second) of Torts, to this case. Those sections provide:

> S 623A. Liability for Publication of Injurious Falsehood -- General Principle
>
> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statemen t to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>
> (b) he knows that the statement is false or ac ts in reckless disregard of its truth or falsity.

S 626. Disparagement of Quality -- T rade Libel

The rules on liability for the publication of an
injurious falsehood stated in S 623A apply to the
publication of matter disparaging the quality of
another's land, chattels or intangible things, that
the publisher should recognize as likely to r esult in
pecuniary loss to the other through the conduct of
a third person in respect to the other's interests in
the property.

Before turning to the task of applying these principles to
the record in this case, we note that the"General Principle"
set forth in S 623A of the Restatement (Second) of Torts is
subject to the following two "caveats:"

Caveats:

The Institute takes no position on the questions of:

(1) Whether, instead of showing the pub lisher's
knowledge or reckless disregard of the falsity of the
statement, as indicated in Clause (b), the other may
recover by showing that the publisher had either

(a) a motive of ill will toward him, or

(b) an intent to interfere in an un privileged manner
with his interests; or

(2) Whether either of these alternate ba ses, if not
alone sufficient, would be made sufficient by being
combined with a showing of negligence regar ding the
truth or falsity of the statement.

The commentary to S 623A explains that these caveats
are necessary because of recent jurisprudence of the United
States Supreme Court tailoring the common law of
defamation to the demands of the First Amendment and
because of uncertainty concerning the extent to which this
jurisprudence may also apply to "injurious falsehood." In
this context, Comment (d) to S 623A describes the state of
the preexisting common law as follows:

In addition to the knowledge-or-reckless-disregard
basis for liability set out in Clause (b), the common law
recognized two others as alternatives. At common law,

10

the publisher of an injurious falsehood was also held subject to liability, (1) if he was motivated by ill will toward the other (malice, in the factual sense), or (2) if he intended to interfere with the inter ests of the other in an unprivileged manner (intent to harm). Knowledge or reckless disregard as to falsity has not been a requirement for these other two bases of liability at common law.

These caveats are not applicable here. Nothing in the record suggests that Highmark was motivated by ill will towards Neurotron or that its purpose was to harm Neurotron's business in an unprivileged manner. There is no evidence that would support an inference that Highmark's purpose was anything other than to communicate its position on CPT to its participating health care providers, a purpose that is clearly a privileged one.

The discussion of these caveats in the Restatement commentary is helpful here, however, because it goes on to document that in the absence of actual ill will towards the plaintiff or an intent to injure for an unprivileged purpose, negligence regarding the falsity of the disparaging statement was not a sufficient basis for imposing liability at common law. See Restatement (Second) of T orts S 623A cmt. d ("In an action for injurious falsehood, negligence [regarding falsity] has not been a sufficient basis at common law to impose liability.").

In concluding that the Supreme Court of Pennsylvania would look to the Restatement (Second) of T orts for the law governing this case, we have not been unmindful of that Court's decision in Menefee v. Columbia Br oadcasting System, Inc., 329 A.2d 216 (Pa. 1974). Menefee, the plaintiff, alleged that he had been a successful radio personality. His employer terminated his employment and allegedly told the press that he was "incompetent in the performance of his assigned broadcast duties." Menefee died after filing suit. Under Pennsylvania law, libel and slander causes of action abate at death but other tort claims survive. The Pennsylvania Supreme Court held that Menefee had a cause of action for "untruthful disparagement" of his interest in his br oadcast career which was governed by the two-year statute. It relied upon

11

SS 624 and 633 of the Restatement (First) of Torts, the then current Restatement, in the course of establishing that the alleged injury to Menefee's broadcast career gave rise to a tort distinct from the defamation claim arising from the injury to his personal reputation. The case presented no issue with respect to whether liability could be predicated on a negligent misrepresentation regarding Menefee's professional competence.

Neurotron finds Menefee important because S 624 of the Restatement (First) of Torts describes the general rule governing liability for "trade libel" without requiring that the defendant must either have known his statement to be false or have made it with reckless indifference as to its truth or falsity. While Neurotron correctly characterizes the position taken by the Restatement at the time Menefee was decided, that decision does not persuade us that the prediction found in Pro Golf is in error. We believe the Pennsylvania Supreme Court, if presented with this case, would accept the Restatement (Second) as the most reliable collation of the common law of injurious falsehood. As we have noted, that Court has not hesitated to follow the current Restatement of Torts even when it is in tension with Pennsylvania's own prior jurisprudence. Menefee did not involve the determinative issue here, and we have found no other Pennsylvania precedent inconsistent with S 623A's requirement of actual knowledge of falsity or reckless indifference. The inclusion of that requirement was the product of a careful reevaluation of the common law precedents by the American Law Institute.3 If called upon to

_____

3. The first Restatement, based in part on an influential law review article published in 1913, adopted the view that where no privilege existed, the case law called for strict liability for false disparagement without regard to innocence, good intentions or honest belief. Based primarily on a review of the case law by Dean Prosser in Injurious Falsehood: The Basis of Liability, 59 Colum. L. Rev. 425 (1959), which found the common law more analogous to fraud and interference with contract rather than defamation, the Restatement (Second) reflects the view that there is liability when (1) "the defendant knowingly or recklessly speaks a falsehood," (2) "acts from a spite motive," or (3) "out
of a desire to do harm for its own sake." See Prosser and Keeton On the Law of Torts S 128 (5th ed. 1984).

decide this dispositive legal issue for the first time, we are confident that the Pennsylvania Supreme Court would accept the consensus reached as a result of this reevaluation. Finally, we find it significant that the Pro Golf, Zerpol, and Swift Brothers opinions bear evidence that each of these courts had focused on Menefee in the course of concluding that the Pennsylvania Supreme Court would follow the Restatement (Second) of Torts .4

It necessarily follows that summary judgment was properly entered in favor of Highmark unless the record would support a finding that Highmark acted with actual knowledge of the falsity of its PRN statement or with reckless disregard of whether it was true or false.

C. The Record

We start by asking whether the summary judgment record would support a finding that those at Highmark responsible for the PRN article knew or believed that the clinical value of CPT had been proven to the medical community. It will not. The internal Highmark documentation indicates that it believed the clinical value had not been generally accepted in the medical community, and we find no evidence to the contrary.5 Moreover, notably

_____

4. We conclude that Neurotron's reliance on our decision in U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914 (3d Cir. 1990) is also misplaced. In U.S. Healthcare, the parties had engaged in a heated advertising war, ultimately suing each other for various reasons including alleged commercial disparagement. The District Court granted the defendants' renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on the gr ounds that the defendants' advertisements were protected by the actual malice standard of the First Amendment as articulated by New York T imes Co. v. Sullivan, 376 U.S. 254 (1964), and that the plaintiff had not met the applicable clear and convincing standard of proof requirement. U.S. Healthcare, 898 F.2d at 920. This Court reversed, holding that the New York Times actual malice requirement did not apply to purely commercial speech. The portion of the Restatement (Second) of Torts that we find dispositive here is based upon common law uninfluenced by New York Times and its progeny.

5. The record does contain a March 27, 1995, letter from Dr. Sotoudish to Diana Perota of Highmark's Medical Policy Department in response to

13

absent from the record is any evidence of a reason why Highmark would represent that the clinical value had not been established in the medical community when it knew or believed to the contrary. While Neurotron speculates in its brief about possible economic motives for Highmark's wanting to suppress use of CPT even though it is less expensive than the generally accepted nerve conduction studies,6 no hint of such motivation is found in Highmark's internal documentation, and there is no expert analysis supporting any of those suggested motives.

This leaves the question of whether Highmark's PRN statement was made with reckless indiffer ence as to whether the clinical value of CPT had been pr oven to the medical community. Here also we conclude that the summary judgment record would not support a finding in Neurotron's favor.

The record reflects that Highmark had a department whose function it was to ascertain whether a tr eatment at any given time was investigative as that ter m is defined in its contracts. Moreover, that department had established guidelines for making such determination. The record suggests nothing unreasonable about these institutional arrangements.

In 1990 and again in 1994, Highmark, utilizing this previously established apparatus, undertook to determine the current status of CPT in the medical community. In each instance it engaged the services of thr ee qualified medical experts as consultants. Nothing in the r ecord suggests any deficiency in the process by which these consultants were selected. The recor d does reflect that Neurotron, in 1994, asked that certain physicians not be

_____

an inquiry about nerve conduction studies, a dif ferent form of testing, and their use in the context of diabetic neur opathy. On page three of that four page letter, there is a single mention of CPT as an alternative to nerve conduction studies in diabetic neur opathy. This isolated reference in a letter on another subject will not support an inference that those responsible for the PRN believed that their statement was false.

6. Dr. Katims in his correspondence with Highmark emphasizes the cost effectiveness of using CPT.

chosen because they were viewed by Neur otron as having a conflict of interest and that none of the physicians named was chosen. On both occasions, Highmark provided its chosen experts with the relevant information it had accumulated on the subject of inquiry including the materials that it had been supplied by Neurotr on. In 1990 that information consisted of Neurotr on literature describing the Neurometer, and a jour nal article with references to other materials on CPT and the Neurometer. In 1994, that information consisted of Neur otron literature describing the Neurometer, a bibliography of literature on CPT, and a list of medical institutions then currently using the Neurometer. In both 1990 and 1994, each of the three experts responded that CPT was not accepted in the medical community as having value in the diagnosis and treatment of patients.

While no full evaluation of CPT was conducted in 1996, an investigation of suspected misbillings for nerve conduction velocity studies in that year produced letters from two expert consultants tending to confir m the results of the six independent evaluations conducted earlier . Most importantly, in addition to this uniform pr ofessional opinion, as of February, 1997, when the PRN was published, not a single participating physician had asked Highmark to make CPT a covered service or had complained about a failure to reimburse a payment for CPT.

Based on the foregoing, we conclude that the r ecord establishes a rational basis for Highmark's PRN statement. This is not to say that Neurotron has been unable to come forward with a number of legitimate criticisms of that statement and of the process by which it came to be made. However, those criticisms, individually or in combination, do not permit a reasonable inference that Highmark made its PRN statement with reckless indiffer ence as to its truth.

Neurotron has tendered expert testimony tending to show that there were doctors using CPT prior to 1997 who believed it to be useful in their practice. It has also produced literature that reports on such use by medical professionals. This evidence does not, however , demonstrate that Highmark proceeded with reckless indifference. As we

15

have noted, because the PRN statement did not state to whom the utility of CPT had not been proven, the only reasonable inference is the medical community. That concept necessarily posits situations in which ther e will have been some use, but use short of community acceptance. Highmark's independent consultants wer e clearly aware that CPT was being used by health care professionals and appeared in the medical literature. Nevertheless, they unanimously opined that the CPT's clinical utility had not been accepted in the medical community.

Neurotron believes that Highmark's consultants did superficial studies of the peer reviewed literature and would have reached a different result had they conducted reasonably careful studies. It faults Highmark for not doing "due diligence" reviews to assure the quality of the consultants' performance and points to an instance in which a consultant informed Highmark that he had not read all of the articles in Neurotr on's bibliography. Those at Highmark familiar with its use of consultants testified that Highmark selected its consultants with care, called upon them to do whatever they believed necessary to have an informed opinion, and trusted in their pr ofessional judgment. One can perhaps debate the merits of Highmark's approach in this area, but one cannot, we believe, accurately classify it as reckless indifference to the truth.7

Neurotron also insists that Highmark intentionally prejudiced its consultants' studies by indicating the outcome it desired in its letters of engagement and by suggesting standards other than clinical utility for its

_____

7. Contrary to Neurotron's suggestion, we find no probative value in what it characterizes as an "admission" of counsel that Highmark "had not conducted proper reviews." Appellant's Br. p. 17. After Highmark had been sued by Neurotron, counsel was quoted as speculating in a letter that "they are probably in the tr ouble (sic) they are in because they said
the machine had no clinical utility and did not have their experts review the material that Katims offered to pr ovide them." App. II at 86a. We view this as hindsight speculation about why Highmark is in litigation and not a confession concerning liability for reckless indifference or even
negligence.

16

consultants to apply. However, the evidence indicates no more than that (1) Highmark described its existing no coverage position in the course of explaining the r eason for the inquiry and (2) Highmark asked whether CPT had clinical utility beyond the presently used testing in addition to its inquiry about whether CPT's clinical utility had been established. We conclude that a reasonable factfinder could not draw the inference from this evidence that Neurotron suggests.

Finally, Neurotron urges that one of Highmark's consultants during the 1994 evaluation advised it that CPT was "safe and effective." App. III at 172a. The inference it suggests is that Highmark knew its PRN statement regarding a lack of proven utility was false or at least was recklessly indifferent to whether CPT was efficacious. In context, its is clear that Dr. Silver man was acknowledging that CPT was safe and measured what it purported to measure. The letter is not inconsistent with Dr . Silverman's overall view that CPT's utility had not been demonstrated to the medical community.8

III.

Finding no material dispute of fact as to an essential element of Neurotron's case, we will affirm the summary judgment entered by the District Court.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

_____

8. Prior to the "safe and effective" statement, Dr. Silverman's letter states
that "this test is not used by neurologists or plastic surgeons secondary to its poor reliability and subjective natur e." The letter concludes, "Overall, this procedure is not in the mainstream and is not used by mainstream physicians in our area." App. III at 172a.

17